UNIVERSAL GYM EQUIPMENT, INC.,
Plaintiff-Cross-Appellant,

v.

ERWA EXERCISE EQUIPMENT LIMIT-
ED and Global Gym and Fitness Equip-
ment Limited, Defendants-Appellants.

Nos. 86–1681, 87–1019.

United States Court of Appeals,
Federal Circuit.

Sept. 2, 1987.

George T. Mobille, Cushman, Darby & Cushman, Washington, D.C., argued for defendants-appellants. With him on the brief, was Robert W. Adams. Also on the brief, was Robert E. Sharkey, Gordon, Feinblatt, Rothman, Hoffberger & Hollander, Baltimore, Md., of counsel.

Gordon D. Coplein, Darby & Darby, P.C., New York City, argued for plaintiff-cross-appellant. With him on the brief, were Melvin C. Garner and Peter C. Schechter.

Before FRIEDMAN, Circuit Judge, SKELTON, Senior Circuit Judge, and SMITH, Circuit Judge.

FRIEDMAN, Circuit Judge.

These are an appeal and a cross-appeal from a judgment of the United States District Court for the District of Maryland, in a suit charging patent infringement, breach of contract, and unfair competition. *See Universal Gym Equip., Inc. v. Atlantic Health & Fitness Prods.*, 229 USPQ 335 (D.Md.1985) (oral opinion on liability only). The court ruled that the patent had not been infringed and that the defendants had not engaged in unfair competition, but that the contract had been breached, and awarded damages for the breach. We uphold the findings of noninfringement and breach of contract, but remand the case to the district court to reconsider and, if necessary, to recalculate the damages.

I

A. *Background.* Universal Gym Equipment, Inc. (Universal) manufactures and sells exercise weight-lifting machines. It brought the present suit against Atlantic Health and Fitness Corporation (Atlantic), ERWA Exercise Equipment Limited (ERWA) and ERWA's wholly-owned subsidiary, Global Gym and Fitness Equipment Limited (Global), which also manufactures and sells exercise weight-lifting machinery.

Both Universal and Global make and sell "standard resistance" and "variable resistance" weight-lifting machines; in the latter, the amount of force the user is required to exert varies during the exercise cycle. Such variation apparently is desirable because it corresponds to the variations in available muscle strength during exercise, so that the muscles are continuously worked at a level of nearly maximum effort.

The complaint charged (1) that the three defendants had (a) infringed Universal's U.S. Patent Re. 31,170 (the '170 patent), and (b) engaged in unfair competition and misused trade secrets, and (2) that ERWA and Global (as ERWA's successor) had breached a 1972 contract between Universal and ERWA. The complaint sought damages, an injunction, and specific performance of the contractual provision allegedly violated.

The three defendants denied the allegations of the complaint. They also counterclaimed for a declaratory judgment that the patent was invalid and that they had not infringed it. Global also asserted in the counterclaim that Universal had violated the antitrust laws, engaged in unfair competition, and conspired to interfere and

interfered with Global's business relations. At the end of the trial, the court dismissed the latter three claims, and no appeal has been taken from that ruling.

B. *The Patented and the Allegedly Infringing Exercise Machines.* The exercise machine described in the '170 patent is shown in the illustration below, which is based upon one of the drawings in the patent:

The carriage is attached around both the lever arm and the vertical shaft by rollers, from which carriage the weight stack hangs; the placement of the pin determines the number of weights lifted. The user operates the device by lifting the lever arm by the handle. As the handle is lifted, the lever arm pivots on its fixed axis, and the carriage moves up the vertical shaft while also sliding along the lever arm. The sliding of the carriage along the lever arm as the handle is lifted continuously increases the relative length of the part of the lever arm that is supporting the carriage (and thus the weight stack) while correspondingly decreasing the length of the part of the lever arm between the carriage and the handle. This increases the upward force that the user is required to apply to the handle to lift it further.

Universal asserted that the Global variable resistance exercise machine infringed claims 5 and 6 of the '170 patent. The claim language that is critical to this case describes "a frame" and "a lever arm" that is "pivotally mounted in said frame at a lever arm pivot and pivotally movable by a user through an exercise cycle," with a handle "interconnected with said lever arm at a location remote from and in fixed relationship to the lever arm pivot for applying pivotal movement force thereto." *See id.* at 339.

The Global machine is shown in the illustrations below, which are based upon the drawings in Global's U.S. Patent No. 4,354,675:

The first carriage is attached around the angled shaft by rollers. The second carriage is attached around the vertical shaft by rollers, from which carriage hangs the weight stack; the placement of the pin determines the number of weights lifted. The link of fixed length connects the two carriages. The user operates the device by lifting the first carriage by its handle. As the first carriage is lifted and slides up the angled shaft, the link pulls the second carriage, which slides up the vertical shaft. As the handle is lifted higher and the carriages rise along their respective shafts, the shafts (and therefore the carriages) become farther apart, which, because of the fixed length of the link, increases the upward force that the user is required to apply to the handle to lift it further.

C. *The Contract.* In 1972, Universal and ERWA entered into an agreement under which ERWA could manufacture, market, and sell Universal exercise machines in Canada under Universal trademarks, in return for paying royalties to Universal. The agreement obligated Universal to "provide [ERWA] with plans and specifications which [Universal] has found necessary to insure proper assembly and performance of Licensed Product," as well as to "make [Universal]'s engineer available to [ERWA] in Canada for the purpose of acquainting [ERWA] with said know-how." ERWA promised to keep the technical knowledge thus acquired confidential.

The agreement provided for termination, by either party without cause, upon 6 months' notice. Paragraph 18 of the agreement further provided that after termination ERWA

> shall not thereafter manufacture, use, sell, or distribute any products which include any of the features, designs, technical information, or said know-how of [Universal] and will not thereafter use Licensed Trademarks or any other trademark or trade style in any way similar to any of those of [Universal].

*Universal,* 229 USPQ at 345. Universal gave notice of termination on April 12,

1978, and the agreement terminated as of November 20, 1978.

In August 1978, ERWA's principals formed Global as a wholly-owned subsidiary of ERWA. On November 21, 1978, using ERWA's facilities and employees, Global began manufacturing and selling exercise equipment; ERWA became a holding company.

D. *The District Court's Decisions on Liability and Damages.*

1. *Liability.*

(a) After reviewing the "claims, the patent specification, the patent drawings, and the expert testimony," as well as the patented and accused devices themselves, the district court concluded that Global's device does not literally infringe the Universal patent because not all of the elements of the claims are present in the Global device. *Id.* at 340–41. The court first found that the '170 patent "lever arm" and the Global "link" function "in an entirely different manner," particularly because Universal's lever arm must be rigid while Global's link need not be. *Id.* at 341. The court also found that Global's "link" was not "pivotally mounted in said frame," as is the "lever arm" of the '170 patent claims, because it was not attached to the frame at all: "the [claim] language does not simply mean that the lever arm is somehow within the dimensions of the frame." *Id.*

The district court also found no infringement under the doctrine of equivalents. It found that "the Global device operates in a very different way from the Mazman invention [the '170 patent] in its achievement of variable resistance, the similar result, for the several reasons it has explained earlier in this opinion." *Id.* at 343.

(b) After determining that under the governing California law Global was ERWA's "corporate alter ego," and, as such, was "bound by the 1972 agreement between ERWA and Universal," *id.* at 345, the district court ruled that paragraph 18 of the agreement

means exactly what it says: that if [Global's standard resistance machine] does contain any Universal features and designs, the contract has been breached. It is irrelevant to the question of breach whether these items were already in the public domain or were reverse engineered, because the parties freely contracted to limit the items' use after the termination of the contract.

*Id.* at 346.

The district court then found that the Global standard resistance exercise machines incorporated Universal's "features and designs." *Id.* at 347. The court relied on "the testimony of Frank Smith, Universal's national sales manager, who compared over 100 slides of the same components of the Universal and Global machines and found numerous features and designs that were the same." *Id.* at 345.

The court found, however, that "[u]nlike the evidence submitted as to features and designs, the evidence relating to [misuse or appropriation] of technical knowledge and know-how does not sustain the plaintiff's burden of proof." *Id.* at 347. The court also found that Universal had not transferred any confidential information to Global in the course of the contract. *Id.* at 348. Universal has not challenged on appeal the court's rejection of its state law trade secret and unfair competition claims.

2. *Damages.* In its oral opinion on damages, rendered after a second bench trial, the court awarded Universal damages of $6,351,798.20. *Universal Gym Equip., Inc. v. Atlantic Health & Fitness Prods.,* No. B-80-446, transcript of oral op. at 21 (D.Md. May 23, 1986). This consisted of (1) $2,207,802.70 for the profits Universal lost as a result of the breach of paragraph 18 of the agreement, (2) $3,267,615.50 in pre-judgment interest, and (3) $876,380.00 for loss of future business. *Id.* at 14, 15, 17. The court denied Universal's request for an injunction against future violation of paragraph 18 because, as Universal had recognized, such injunctive relief was an alternative to damages for future losses. *Id.* at 18–19.

Noting that it was undisputed that California law governed the determination of damages, the district court applied California Civil Code § 3300, which provides:

For the breach of an obligation arising from contract, the measure of damages ... is the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom.

*Id.* at 5. The court read this provision as "restat[ing] the familiar rule, applicable in virtually all jurisdictions, that breach of contract damages should place the non-breaching party in as good a position as if the contract had not been breached." *Id.*

The court first rejected Global's argument that the "features and designs" that paragraph 18 covered did not include machines on which Global did not pay royalties under the agreement:

The contract itself does not limit the restriction to machines subject to royalty payments; to the contrary, it prohibited the manufacture or sale of *any* machines containing features and designs of Universal Gym. Whatever doubt there may have been on the issue of whether all seven categories of machines should be subject to the award of damages was removed by the testimony of the defendants['] own witness[, who] testified at length that many machines for which Global or its predecessor had paid no royalties in fact contained features and designs of Universal Gym equipment. It is the presence of the features and designs, not the payment of royalties, that determines whether the machine in question is subject to an award of damages....

*Id.* at 6–7.

The court also rejected Global's contention that damages should be limited to the proportion of the machines' parts comprising the "features and designs" of Universal (which Global asserted was no more than 10.6 percent):

This argument must be rejected as both illogical and in clear contradiction to the

express language of the contract[, which] prohibited the manufacture o[r] sale of any *products* which included *any* of Universal's features and designs. The use of the word "products" indicates beyond any question that in fact entire machines were contemplated as being subject to the breach of contract provision; the fact that such features or designs might constitute only 10.6% of the total number of parts is simply irrelevant.

*Id.* at 7–8.

The district court accepted Universal's evidence that Universal possessed enough excess capacity that most of its costs were fixed, so that an "increase in sales volume, up to 5 million-dollars, would result in an almost negligible increase in variable costs, for example, only 1.6% for an increase of 2.5 million in sales." *Id.* at 9. The court therefore concluded that Universal's "gross profits is the proper measure of damages," less a "deduction of the minor increase in variable costs of approximately 1.6%." *Id.* at 11.

The district court, however, rejected Universal's assertion that it should be awarded damages based on Global's total sales, *i.e.*, the contention that, but for Global's breach, Universal would have made all of the sales made by Global:

The defendants presented substantial evidence at trial indicating that a variety of factors goes into any sales situation and that price is not necessarily determinative of the outcome of the bidding process. Indeed, the success of the Nautilus line of equipment, which is far more expensive than either Universal or Global, proves this point.

*Id.* at 11–12.

Instead, the court awarded damages based upon the percentage of Global's sales that represented Universal's share of the market excluding Global's sales:

Having no other basis upon which to calculate Universal's market share, the Court accepts the United States sales as the most appropriate means of calcula-

tion. Thus, the total sales market for [1984] is shown to be $19,900,000.00 from which Global's $2,600,000.00 should be subtracted, leaving 17,300,00.00 in sales if Global's are not included. Universal's sales for the same year in the United States market were $7,300,000.00, or a market share of 42.19%. The Court finds by a preponderance of the evidence that 42.19% is the percentage of sales Universal might have made. There is no more precise means of calculation on the basis of the evidence presented.

Applying a 42.19% to the plaintiff's damage claims of $5,233,000.00 for the seven categories of machines yields a final figure of $2,207,802.70 in actual damages for the machines containing Universal's features and designs.

*Id.* at 13–14.

As noted, the court initially awarded prejudgment interest, based on data provided by Universal "reflect[ing] the bank prime rate for the years 1978–1985," of $3,267,-615.50. *Id.* at 14–15. When it issued its final judgment, however, the district court reduced the prejudgment interest to $1,059,812.80, after Universal "brought to the attention of the Court an error in the calculation of damages, resulting from the Court's inadvertent misreading of the plaintiff's damages exhibit." *Universal Gym Equip., Inc. v. Atlantic Health & Fitness Prods.*, No. B–80–446, slip op. at 1 (D.Md. July 23, 1986). The court rejected "additional suggestions on adjustments of the final damage calculation" submitted by "[c]ounsel for both sides," because they were not "timely." *Id.* at 2. The final damages award was $4,143,995.50. *Id.*

"In view of Global's dissolution," Universal has withdrawn its appeal of the denial of injunctive relief. The award of damages for loss of future business has not been appealed.

## II INFRINGEMENT

As noted, the district court ruled that Universal had not established infringe-

ment, either literal or under the doctrine of equivalents. Universal here challenges only the latter ruling.

A device that does not literally infringe a patent nonetheless may infringe "if it performs substantially the same function in substantially the same way to obtain the same result." *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 608, 70 S.Ct. 854, 856, 94 L.Ed. 1097, 85 USPQ 328, 330 (1950) (quoting *Sanitary Refrigerator Co. v. Winters*, 280 U.S. 30, 42, 50 S.Ct. 9, 13, 74 L.Ed. 147 (1929)); *Hughes Aircraft Co. v. United States*, 717 F.2d 1351, 219 USPQ 473 (Fed.Cir.1983). Infringement under the doctrine of equivalents is a question of fact. *Graver Tank*, 339 U.S. at 609, 70 S.Ct. at 856, 85 USPQ at 331. The issue before us is whether the district court's finding of no infringement is clearly erroneous. Fed.R.Civ.P. 52(a); *Thomas & Betts Corp. v. Litton Sys., Inc.*, 720 F.2d 1572, 1579, 220 USPQ 1, 6 (Fed.Cir.1983). We hold that it is not.

As the case comes to us, the only issue is whether the Global exercise machine functions "in substantially the same way" as the patented Universal machine. In holding that it does not, the district court found that the '170 patent "lever arm" and the Global "link" function "in an entirely different manner," particularly because Universal's lever arm must be rigid while Global's link need not be. *Universal*, 229 USPQ at 341. The court further found that Global's "link" was not "pivotally mounted in said frame," as is the "lever arm" of the '170 patent, because the link was not attached to the frame—as the claim requires—at all. The court stated that "the [claim] language does not simply mean that the lever arm is somehow within the dimensions of the frame." *Id.* Although the court made these findings in connection with its analysis of literal infringement, it relied on them as the basis for its finding of no infringement under the doctrine of equivalents.

The court rejected Universal's contention that its patent is a pioneer patent which is

entitled to a broad range of equivalents. *Id.* at 342. Noting that there was a conflict in the expert testimony whether the '170 patent constituted a major advance in the variable resistance exercise machine field, the court accepted the evidence that it did not.

■ We cannot say these underlying findings are clearly erroneous or that they do not support the court's ultimate finding of no infringement under the doctrine of equivalents.

Universal argues, however, that because of the "virtual identity of results" in the Global and the '170 patent machines, "there has to be at least substantial sameness in the way in which the result is achieved." Universal asserts that what it describes as the "most objective evidence" on infringement "cannot destroy equivalency between the accused structure and the claims of the Re. '170 patent."

■ This argument turns equivalents analysis on its head. The fact that the two devices achieve substantially the same result creates no presumption that they do so in substantially the same way, much less one that the alleged infringer must "destroy." The patentee has the burden of proof to show that the accused device infringes the patent claims, and to do so under the doctrine of equivalents requires a showing that all three components of the equivalency test are met. The district court held that Universal had not carried that burden with respect to the "substantially-the-same-way" element, and we have no reason to reject that conclusion.

## III BREACH OF CONTRACT

A. ERWA and Global (collectively Global) contend the district court improperly upheld and applied paragraph 18 of the agreement in violation of *Sears, Roebuck & Co. v. Stiffel Co.*, 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed.2d 661, 140 USPQ 524 (1964), and *Compco Corp. v. Day-Brite Lighting, Inc.*, 376 U.S. 234, 84 S.Ct. 779, 11 L.Ed.2d

669, 140 USPQ 528 (1964). According to Global, these cases state that "when a publicly available article is unprotected by a patent or copyright, state law (there Illinois and here California) may not forbid others from making that article." Global further contends: "To the same effect is *Kewanee Oil Co. v. Bicron Corp.,* 416 U.S. 470, 476, 94 S.Ct. 1879, 1883, 40 L.Ed.2d 315, 181 USPQ 673, 676 (1974), and *Lear, Inc. v. Adkins,* 395 U.S. 653, 668, 89 S.Ct. 1902, 1910, 23 L.Ed.2d 610, 162 USPQ 1, 7 (1969), both of which decisions recognized that ideas in general circulation are dedicated to the common good unless they are protected by a valid patent."

In other words, Global contends that those cases establish that the patent law preempts the application of state law to provide relief for the breach of the contract provision involved in this case.

We think that Global reads these decisions too broadly and that properly interpreted they do not preclude the application of state law to provide a damages remedy for Global's breach of paragraph 18 of the agreement.

*Sears* and *Compco* held that the patent law bars the application of state unfair competition law to "prohibit the copying of the [unpatented and uncopyrighted] article itself or [to] award damages for such copying." *Sears,* 376 U.S. at 232–33, 84 S.Ct. at 789, 140 USPQ at 528; *Compco,* 376 U.S. at 237, 84 S.Ct. at 782, 140 USPQ at 530 ("Today we have held in *Sears, Roebuck & Co. v. Stiffel Co., supra,* that when an article is unprotected by a patent or a copyright, state law may not forbid others to copy that article"). *Kewanee* held that the patent law does not preempt the application of state trade-secret law and that that law could be applied to enjoin and grant damages for the use or disclosure of trade secrets obtained during employment, which the employee had agreed not to disclose. *Lear* held that a licensee of a patent is not estopped from challenging the validity of the patent because, as the court stated in *Kewanee,* "an invalid patent was so

serious a threat to the free use of ideas already in the public domain. . . ." 416 U.S. at 488–89, 94 S.Ct. at 1889, 181 USPQ at 681.

*Sears, Compco,* and *Lear* did not present any question about the compatibility with patent law of an agreement barring a company that was licensed to manufacture and sell another company's product from including any of the "features and designs" of the licensor's product in products the licensee manufactured after the license agreement was terminated. *Sears* and *Compco* involved only the compatibility with federal patent law of applying state unfair trade law to bar copying of an unpatented product of a company with which the copier had no contractual relations. *Lear* involved a wholly unrelated question. In the only one of the four cases that involved an agreement between the parties to the dispute, *Kewanee,* the Court held that the patent law did *not* preempt the remedy that state trade-secret law could provide against breach of the confidentiality agreement.

Although there is some broad language in the opinions in those cases that, read out of context, provides some support for Global's contention, we decline Global's invitation to extend the holdings in *Sears* and *Compco* to the significantly different situation before us.

The rationale of *Sears* and *Compco* was that under the patent law "the prerequisites to obtaining a patent are strictly observed, and when the patent has issued the limitations on its exercise are equally strictly enforced," 376 U.S. at 230, 84 S.Ct. at 788, 140 USPQ at 527, so that

[t]o allow a State by use of its law of unfair competition to prevent the copying of an article which represents too slight an advance to be patented would be to permit the State to block off from the public something which federal law has said belongs to the public. The result would be that while federal law grants only 14 or 17 years' protection to genuine inventions, see 35 U.S.C. §§ 154, 173,

States could allow perpetual protection to articles too lacking in novelty to merit any patent at all under federal constitutional standards. This would be too great an encroachment on the federal patent system to be tolerated.

*Id.* at 231–32, 84 S.Ct. at 789, 140 USPQ at 528.

The concerns that underlie the Court's decisions in *Sears* and *Compco* are not involved in the district court's validation and enforcement of paragraph 18 of the agreement.

■ The question in this case is not whether the patent law bars the state from granting relief under its unfair competition law against copying an unpatented article. The question is whether the patent law precludes the application of state law to validate and award damages for a licensee's breach of a contractual provision by which the licensee agreed that, after its license to manufacture the licensor's product had terminated, the licensee would not include the licensor's features and designs in the licensee's products. In our view the patent law does not preclude the application of state contract law to provide damages for breach of this agreement.

The district court found that, before entering into the agreement with Universal, Global had obtained a Universal machine on the open market and reverse-engineered it—which Global was free to do. *Cf. Stanley Aviation Corp. v. United States*, 196 USPQ 612, 620 (D.Colo.1977) ("None of the contracts prohibits reverse engineering ...."); *Pennwalt Corp. v. Akzona, Inc.*, 570 F.Supp. 1097, 1115 (D.Del.1983) ("The [product] w[as] given to Pennwalt without restrictions on its use ...."), *aff'd*, 740 F.2d 1573, 222 USPQ 833 (Fed.Cir.1984). At that time Global, like anyone else, could have itself reverse-engineered, manufactured, and sold a copy of the Universal machine. *Universal*, 229 USPQ at 346; *see, e.g.*, *Smith v. Chanel, Inc.*, 402 F.2d 562, 159 USPQ 388 (9th Cir.1968). Global, however, chose not to do so.

■ Instead, Global entered into a contract with Universal, in which Universal authorized Global, in return for royalty payments, to manufacture and sell the Universal machine under the Universal trademark, and Global agreed to not use any of the features and designs of Universal's machine after the agreement terminated. The fact that this agreement prevented Global from using information that it previously had gleaned by reverse engineering is irrelevant. Parties to a contract may limit their right to take action they previously had been free to take. The *Sears/Compco* doctrine nullifies a private contract only if enforcement of the contract would conflict with the patent law. *Cf. Lear*, 395 U.S. at 670–71, 89 S.Ct. at 1911, 162 USPQ at 8; *compare Aronson v. Quick Point Pencil Co.*, 440 U.S. 257, 99 S.Ct. 1096, 59 L.Ed.2d 296, 201 USPQ 1 (1979) *with Brulotte v. Thys Co.*, 379 U.S. 29, 85 S.Ct. 176, 13 L.Ed.2d 99, 143 USPQ 264 (1964). As we have shown, the validation and application of paragraph 18 by the district court does not impinge on the patent law.

B. Global challenges on a number of grounds the district court's determination that Global violated paragraph 18 of the agreement. Global contends (1) that the district court's finding that Global purchased and reverse-engineered a Universal machine prior to entering into the 1972 agreement is inconsistent with the determination that Global violated the agreement; (2) that Global's use in its machine of certain items it purchased from suppliers' catalogs meant that those parts could not constitute "features and designs" of the Universal machine; (3) that because the agreement did not define "features and designs," those items must be limited to "confidential proprietary information" that Universal supplied to Global; (4) that because paragraph 18 does not set any geographical or temporal limits upon Global's obligation not to use Universal's features and designs, the provision is an invalid agreement not to compete; and (5) that the district court erroneously failed to specify in its findings the particular Universal

"features and designs" that Global had utilized.

■ The district court adequately dealt with most of these arguments in its opinion, and there is no need for us to discuss them at length. We agree with the district court that the broad language of paragraph 18 prohibiting Global from using "any of the" features and designs of Universal meant what it said and was not limited to use of whatever confidential proprietary information Universal may have supplied to Global; that although many of the parts Global used were off-the-shelf products, "the parts' positions and configurations are unique and constitute Universal features and designs" (*Universal*, 229 USPQ at 347); and that paragraph 18 was not invalid as an agreement not to compete with no temporal and geographical limitations because, unlike the covenants in the cases upon which Global relied, "Global may compete with Universal with one limitation. This limitation is that Global may not use Universal's features, designs, technical knowledge, and know-how." *Id.* at 347.

Although the district court did not make findings specifying the particular Universal "features and designs" the Global machines utilized, the court found that those machines "incorporated many" of the Universal features and designs. That finding was sufficient to establish that Global breached paragraph 18, which prohibited Global from utilizing "any" of Universal's "features" or "designs" in "any products" Global manufactured, used, sold, or distributed. If, as the district court found, Global incorporated "many of" Universal's features and designs in Global's machines, Global violated paragraph 18.

We cannot say that that finding was clearly erroneous, or that it was defective because the court did not specify the particular Universal "features and designs" that Global incorporated in its different models. As the district court pointed out, Frank Smith, Universal's national sales manager, "compared over 100 slides of the same components of the Universal and Global machines and found numerous features and designs that were the same. Photographic copies of these slides were admitted as Plaintiff's Exhibit 74." *Id.* at 345. The court stated:

> "Smith testified that many parts of the Global machine were exactly the same as the corresponding parts of the Universal machine. According to Smith, numerous parts, although so-called off the shelf items in that they are not made by Universal but are purchased from suppliers, perform special functions because of their special use and placement within the structure of the machine. In other words, there is nothing special about the use of a bolt per se, but the use of a bolt to bind together two parts of a machine in a specific place to prevent a specific problem is a special feature."

*Id.* at 347.

The court noted that

> many of the parts themselves may not have special features or designs unique to a Universal machine, but their configuration and relationship to other parts and the role they play in the functioning of the exercise machine are such special features and designs. Smith stated that many of these configurations were developed after years of trial and error by Universal, as part of Universal's endeavors continually to upgrade and improve their machines.

> Smith also showed how some of the Universal parts ... fit right into the Global structure. Smith testified that some of Global's parts are the same as those used on Universal machines at that time when the agreement was in force, although Universal itself is no longer using the parts or the same configurations for various reasons.

*Id.*

The court was "convinced" that

> the pictures and testimony of Smith establish that the parts' positions and configurations are unique and constitute

Universal features and designs. Most of Lais' testimony rebutting Smith's descriptions of the pictures simply stated that the parts were different without stating why. Furthermore, some of the differences were attributable to being differences in sizes due to the use of two-inch tubing instead of 1½-inch tubing, or the use of metrically sized parts instead of parts sized in inches and pounds. In the Court's view, such differences in size do not constitute a sufficient and substantial change in feature or design so as to render these parts outside the scope of Paragraph 18 of the contract.

*Id.*

As indicated, we have no reason to reject that conclusion or the findings and evidence upon which it rests.

## IV DAMAGES

In challenging the damage award, Global mainly repeats the contentions it made in the district court. We find them no more convincing than the district court did.

The district court held that under California law, Universal was entitled to recover the profits it lost as a result of Global's breach of paragraph 18—a standard that Global does not challenge. The court correctly undertook to determine (1) which of the sales that Global made after the agreement was terminated would have been made by Universal if Global had not violated that provision and (2) the profit Universal would have made on those sales.

A. Global contends that the court erred in basing its damage award upon the full profit Universal would have realized from the sales of its machines rather than limiting it to the portion of the profit attributable to the Universal "features and designs" that the particular Global machine incorporated. According to Global:

> During the liability trial, [Universal's sales manager] identified a number of parts he considered to be present in both the [Universal and Global machines].

These totaled 136 parts. [Global's witness] testified during the liability trial that the [Global] machine had a total of 1282 parts. The ratio of 136 parts to 1282 parts results in a percentage of 10.6%, counting each part that [Universal] identified as being present in both ... machines.

Global argues that Universal therefore was entitled to only 10.6 percent of Global's profit.

■ The district court correctly rejected that contention. As the court pointed out:

> Paragraph 18(d) of the 1972 agreement prohibited the manufacture of [sic] sale of any *products* which included *any* of Universal's features and designs. The use of the word "products" indicates beyond any question that in fact entire machines were contemplated as being subject to the breach of contract provision; the fact that such features or designs might constitute only 10.6% of the total number of parts is simply irrelevant. The issue is whether the machines contain any of the features or designs in question.

*Universal,* transcript of oral op. at 7–8.

B. Global argues that its liability should be limited to the sales of machines for which royalties would have been payable under the 1972 licensing agreement. We agree with the district court's reasoning in rejecting this argument:

> The contract itself does not limit the restriction to machines subject to royalty payments; to the contrary, it prohibited the manufacture or sale of *any* machines containing features and designs of Universal Gym.... It is the presence of the features and designs, not the payment of royalties, that determines whether the machine in question is subject to an award of damages.

*Id.* at 6–7.

■ C. Global next contends that the damage award cannot stand because Universal provided no direct evidence that Universal would have made any of the sales

that Global made after the agreement was terminated. The record shows, however, that Universal's sales decreased when, after the termination, Global began selling standard resistance machines that incorporated Universal's features and designs. In these circumstances, and in the absence of any evidence by Global that there was some other convincing explanation for Universal's loss of sales, the district court reasonably inferred causation. *Cf. Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264, 66 S.Ct. 574, 579, 90 L.Ed. 652 (1946).

D. The district court's award of damages reflected the court's finding that, had it not been for Global's violation of paragraph 18, Universal would have made 42.1 percent of the sales that Global made of machines incorporating Universal's "features and designs." That finding was based upon the total share of United States sales of ordinary resistance exercising machines (excluding Global's share of the market), which the district court found Universal had. Global challenges these calculations as based upon an estimate or guess and relating only to one of the seven years for which damages were awarded.

The district court's determination was based upon a table submitted by Universal showing "the relative market share of several companies competing in the United States in the year 1984 and Universal's market share in the worldwide market." Because there was "no other basis upon which to calculate Universal's market share, the Court accepts the United States sales as the most appropriate means of calculation."

Mr. Klinge, Universal's vice president in charge of sales, testified that these market share figures were "based on an estimate by Frank Smith and is strictly an estimate.... These are all estimates based on just our knowledge that we picked up with our experience but no hard data to back them up. This is an industry where figures are not readily available." Global introduced no evidence of its own to contradict this evidence, or to show that the market shares for other years were different from 1984. In the circumstances, we cannot say the district court erred in accepting the only evidence before it dealing with the subject.

Global, however, argues that the district court's damage award was flawed because, in determining Universal's share of the market, the court failed to consider the market share of Nautilus Corporation, which it alleges was Universal's principal competitor. Universal responds that Nautilus' share properly was excluded since the damage award was based upon sales of standard resistance machines and Nautilus manufactured only variable resistance equipment. The difficulty with Universal's position is that it appears that in determining market shares, the district court used data that included both standard and variable resistance machines.

Trial exhibit DX 226 includes three tables showing market shares in the United States. One table shows estimated market shares for standard resistance machines; a second shows those shares for variable resistance machines; and the third shows combined estimated market shares for both types of machines. Nautilus is not included in any of these tables. In contrast, a fourth table, showing estimated worldwide shares excluding the United States, and upon which the district court did not rely, lists Nautilus as one of the companies selling in Europe and Canada.

The figures upon which the district court based its calculations were total market sales of $19,900,000, from which the court subtracted Global's sales of $2,600,000, so that Universal's sales of $7,300,000 gave Universal a market share of 42.19 percent. The court found that this was "the percentage of sales Universal might have made." These sales figures are shown in the third table in DX 226, which includes United States sales of both standard and variable resistance machines.

Since the district court did not explain the reason for its use of these figures, we cannot say whether or not they are correct.

If the district court intended to limit its market share analysis to Global's sales of standard resistance machines and excluded Nautilus because the latter did not make such machines, the proper figures would have been those shown on the first table of DX 226.

If, on the other hand, the court intended its market share analysis to cover both standard and variable resistance machines, as its use of the combined table might suggest, then the court should have explained why (1) Nautilus' sales were excluded, and (2) Global's sales of variable resistance machines (which the court found to not breach paragraph 18) were subtracted along with the sales of standard resistance machines.

■ We therefore must vacate the damage award and remand for the district court to reconsider, and if necessary recalculate, the damages in accordance with this opinion.

E. Finally, Global argues that in computing prejudgment interest (based upon the prime bank rate), the district court improperly used the same rate for the entire six-year period instead of applying the different (and lower) rate for each successive year. In determining prejudgment interest, the court stated:

> The only evidence in the record concerning the appropriate percentage of interest to be applied to those figures is contained in Exhibit B of plaintiff's damages exhibit and in plaintiff's Confidential Appendix A of its post-trial brief. Those figures reflect the bank prime rate for the years 1978 [–] 1985 [and] were obtained from several sources.... The Court accepts those figures as the accurate rates of interest due to the plaintiff in the form of prejudgment interest.

*Universal,* transcript at 14.

At the damages hearing Global apparently did not challenge any of Universal's figures or calculations of prejudgment interest or present any contrary evidence of its own.

After the court had made its damage award, however, Global sent a letter to the court raising the issue it now asserts (and others) regarding the damage award. The court declined to consider these "suggestions on adjustments of the final damage calculation" because they were not "timely." The court did not abuse its discretion in so ruling.

## CONCLUSION

The award of damages is vacated, and the case is remanded for the district court to reconsider and, if necessary, to recalculate the damages in accordance with this opinion. In all other respects, the judgment of the district court is affirmed.

AFFIRMED IN PART, VACATED IN PART, AND REMANDED.