# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 16-30039

United States Court of Appeals
Fifth Circuit

**FILED**
December 16, 2016

Lyle W. Cayce
Clerk

LUV N' CARE, LIMITED,

      Plaintiff - Appellant

v.

GROUPO RIMAR, also known as Suavinex, S.A.,

      Defendant - Appellee

Appeal from the United States District Court
for the Western District of Louisiana

Before BENAVIDES, HAYNES, and GRAVES, Circuit Judges.

JAMES E. GRAVES, JR., Circuit Judge:

Baby products manufacturer Luv N' Care, Ltd. ("LNC") brought this breach of contract action against its former distributor, Groupo Rimar, *a.k.a.* Suavinex, S.A. ("Suavinex"), for selling two products that allegedly copy LNC's product designs in violation of the parties' 2012 Termination Agreement and Mutual Release ("Termination Agreement"). LNC sought damages as well as an injunction prohibiting Suavinex from selling the offending products. Suavinex asserted counterclaims seeking a declaratory judgment that it did not breach the contract and that LNC was not entitled to an injunction. It subsequently moved for partial summary judgment on those claims. The district court granted Suavinex's motion, finding that Suavinex did not breach

No. 16-30039

the Termination Agreement because it did not apply to product designs that were already in the public domain, such as the two products at issue. We conclude that the plain language of the Termination Agreement contains no such limitation. Accordingly, we REVERSE.

## I.     BACKGROUND

### A. Factual Background

LNC is a Louisiana corporation; Suavinex is a Spanish corporation. Both companies design and sell baby products. In 2009, the parties entered into a distribution agreement (the "2009 Distribution Agreement") granting Suavinex the right to distribute LNC products in Spain. The contract had a three-year term. It was the last of a series of distribution agreements that governed the parties' business relationship, which dated back to the 1990s.

At some point before the end of the term, a dispute arose between the parties. In settlement of the dispute, the parties entered into the Termination Agreement on April 12, 2012. The Termination Agreement served to terminate the 2009 Distribution Agreement, but provided that the obligations in Paragraphs 15, 16, and 19 of the 2009 Distribution Agreement, incorporated by reference, would survive termination.[1] These provisions restrict Suavinex's right to copy, use, or disclose various kinds of information pertaining to LNC products. Surviving Paragraphs 15, specifically 15B, and 19 are at issue in this appeal. Paragraph 15 is labeled "Intellectual Property Rights and LNC's Product Design and Packaging." Subsection B of Paragraph 15 provides:

---

[1] Paragraph 3.3 of the Termination Agreement, entitled "Survival of Certain Provisions," states:

> Notwithstanding termination of the Distribution Agreement as provided in Section 1 above or the mutual releases set forth in Section 4 below, the obligations of Groupo Rimar under Paragraph 15 "Intellectual Property Rights and LNC's Product Design and Packaging," Paragraph 16 "Termination of Trademark Rights" and Paragraph 19 "Use of Confidential Information" of the Distribution Agreement shall survive termination of the Distribution Agreement.

2

No. 16-30039

B. Distributor hereby acknowledges and agrees not to copy or utilize any of LNC's formulae, trade secrets, product design, patents, drawings, business plans, prototypes, packaging, procedures and methods [and] any other proprietary designs or information without LNC's written permission.

Paragraph 19, "Use of Confidential Information," provides:

During the term of this Agreement and continuing after the expiration or termination hereof, either party shall not disclose or make accessible to anyone, or make use of the knowledge or information which either party obtains or obtained during the term of this Agreement with respect to formulae, trade secrets, product design, patents, drawings, business plans, prototypes, procedures, and methods [and] any other proprietary designs or information of the other party without the written consent of the other party. Either party acknowledges receipt of confidential and non-confidential proprietary information from the other party. During the term of this Agreement and continuing after the expiration or termination hereof, Distributor agrees not to use in any fashion said information or designs, or any colorable imitations thereof. Any use by Distributor of said information or property without LNC's written consent will convey royalty and commission rights upon LNC at a rate not less than those set herein, without waiving and specifically reserving to LNC any other remedies available to LNC. . . .

LNC asserts that in 2013, it learned that Suavinex had been selling under its own name an orthodontic pacifier and silicone soft top spout cup (a "sippy cup") that copied the design of LNC's Comfort soft shield pacifier and soft silicone spout cup, in violation of Paragraphs 15B and 19. It is undisputed that LNC's pacifier and cup were being sold to the general public for years prior to the execution of the 2009 Distribution Agreement; however Suavinex did not begin selling these products until the parties had an operative distribution agreement.

## B. Procedural Background

On June 6, 2013, LNC filed a petition for breach of contract in the Fourth Judicial District Court, Parish of Ouachita, Louisiana. Subsequently, LNC

3

voluntarily dismissed the suit and filed this action on August 14, 2014 in the United States District Court for the Western District of Louisiana.[2]  LNC asserted claims for breach of contract and sought damages as well as an injunction prohibiting Suavinex from selling the offending products.[3]  On December 22, 2014, Suavinex filed an answer and counterclaims, seeking a declaratory judgment that it was not in breach of contract and that LNC was not entitled to a permanent injunction prohibiting Suavinex from selling the products at issue outside the United States.  Suavinex claimed further that LNC breached the forum selection clause in the Termination Agreement by originally filing suit in state court.  Thereafter, Suavinex moved for partial summary judgment on all three claims.

In an opinion dated September 30, 2015, the district court granted Suavinex's partial summary judgment motion in its entirety.  The district court determined that the disputed paragraphs were unambiguous and protected only LNC's "proprietary" information, not publicly-available information.  First, the district court found that Paragraph 15B restricts the copying or utilization of an enumerated list of items "commonly understood to be proprietary," as well as the catch-all, "any other proprietary designs or information."  It noted that Paragraph 19 contains virtually the same enumerated list and catch-all, but applies to the disclosure of confidential and non-confidential information.  The court then turned to Black's Law Dictionary to define proprietary information as "information in which the owner has a

---

[2] The 2009 Distribution Agreement contained a forum selection clause designating state court as the forum for disputes arising under the contract, whereas the 2012 Termination Agreement required that any such suit be brought in the United States District Court for the Western District of Louisiana.

[3] LNC also asserted a claim for unfair trade practices under the Louisiana Unfair and Deceptive Trade Practices Act ("LUDTPA"), La. Rev. Stat. § 51:1407, but voluntarily moved to dismiss the claim after discovery confirmed Suavinex did not sell any products in Louisiana.  On June 24, 2015, the district court dismissed the LUDTPA claim with prejudice.

protectable interest," and reasoned from intellectual property law that "[a]ny protectable information is usually lost when that information is offered to the public." Because the products at issue were publicly available before the parties entered into the 2009 Distribution Agreement, the court determined that they fell outside the scope of Paragraph 15B, and therefore Suavinex did not breach the 2012 Termination Agreement. Moreover, the district court found that LNC's proposed interpretation would violate principles of Louisiana contract law, which hold that only information that is confidential to at least one of the parties may be protected through contract.

Having concluded that there was no breach, the district court further held that LNC was not entitled to a permanent injunction.[4] In a subsequent order, the district court awarded Suavinex $267,401.25 in attorney's fees as the prevailing party, pursuant to the terms of the Termination Agreement.[5]

## II.     DISCUSSION

### A. Standard of Review

We review a district court's grant of summary judgment *de novo*, applying the same legal standards as the district court." *Tradewinds Envtl. Restoration, Inc. v. St. Tammany Park, LLC*, 578 F.3d 255, 258 (5th Cir. 2009). Summary judgment is proper only when the record demonstrates that no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law. *Condrey v. SunTrust Bank of Georgia*, 429 F.3d 556, 562 (5th Cir. 2005). Further, we review a district court's interpretation of state law *de*

---

[4] The district court also ruled that LNC breached the Termination Agreement's forum selection clause by originally filing this action in state court, and later awarded Suavinex nominal damages for the breach. LNC does not appeal these rulings and therefore they are not before this Court.

[5] Paragraph 5.9 of the Termination Agreement provides that the "prevailing party in a claim . . . arising under this Agreement against another Party shall be entitled to collect reasonable attorney's fees incurred in connection with the claim or suit or the underlying matter."

*novo* and give no deference to its determinations of state law issues. *Tradewinds Envtl. Restoration, Inc.*, 578 F.3d at 258 (citing *Salve Regina Coll. v. Russell*, 499 U.S. 225, 239-40 (1991)).

**B. LNC's Breach of Contract Claim**

LNC contends that the district court erred by ignoring the plain meaning of the contract and imposing an extra-contractual requirement that LNC's product-related information already be protected by some other legal right in order to receive protection under the contract. We agree.

Louisiana law recognizes broad freedom to contract. "Parties are free to contract for any object that is lawful, possible and determined or determinable," La. Civ. Code art. 1971, and "the contract constitutes the law between the parties," *Barrera v. Ciolino*, 636 So. 2d 218, 222 (La. 1994) (citing La. Civ. Code art. 1983). Contractual intent is determined by the words of the contract. *Id.* "When the words of the contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." La. Civ. Code art. 2046. Furthermore, "[e]ach provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole." La. Civ. Code art. 2050. Finally, "[a] contract should be interpreted so as to avoid neutralizing or ignoring a provision or treating it as surplusage." *Hawthorne Land Co. v. Equilon Pipeline Co., LLC*, 309 F.3d 888, 893 (5th Cir. 2002) (citation omitted).

The plain language of Paragraph 15B states that "Distributor hereby acknowledges and agrees not to copy or utilize any of LNC's . . . product design . . . without LNC's written permission." On its face, the clause applies to *any* of LNC's product designs, which would include those in the public domain. Rather than applying Paragraph 15B's plain meaning, the district court imposed the requirement that the design be either confidential or protectable

as intellectual property in order to fall within the definition of "product design." This construction is flawed for several reasons.

First, by requiring that the design already be protected in order to qualify for protection under the contract, the district court effectively rendered Paragraph 15B meaningless. If, for example, Suavinex copied one of LNC's patented product designs, LNC would not need a contract to enforce its rights; it could sue Suavinex for infringement under the patent laws. Furthermore, Paragraph 19 already restricts Suavinex from using any confidential information it receives from LNC. Interpreting Paragraph 15B to apply only to information that is either confidential or already protected as intellectual property renders the provision mere surplusage, violating one of the basic tenets of contract interpretation recognized in Louisiana and elsewhere. *See, e.g.*, *Hawthorne Land Co.*, 309 F.3d at 893.

Suavinex urges us nonetheless to observe the general rule that "[o]nce an inventor has decided to lift the veil of secrecy from his work, he must choose the protection of a federal patent or the dedication of his work to the public at large." *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 149 (1989); *see also Netheler-Hinz GMBH v. Ritter GMBH*, 289 F.3d 351, 355 (5th Cir. 2002) ("Unless protected by patent or copyright, functional product features may be copied freely by competitors in the marketplace."); *Zippo Mfg. v. Manners Jewelers, Inc.*, 180 F. Supp. 845 (E.D. La. 1960) (same). Therefore, according to Suavinex, the district court correctly held that Paragraph 15B cannot protect ideas in the public domain, such as the design of LNC's two products here.

The intellectual property cases, which the district court relied upon in reaching beyond the plain language of the contract, are inapposite. They concern the rights held by an inventor against the public at large, not, as here, the rights and obligations of parties in contractual privity with one another,

who have bargained for benefits beyond what the law itself can provide. Intellectual property law is no barrier to enforcement of a contract under state law, "merely because the contract relates to intellectual property which may or may not be patentable." *Aronson v. Quick Point Pencil Co.*, 440 U.S. 257, 262 (1979) (holding that a company's contractual obligation to pay royalties for the use of inventor's product design was enforceable despite the fact that the design was not patentable and other competitors were free to copy the design without paying royalties).

LNC asserts that in return for the benefits of becoming the exclusive distributor of LNC's innovative products in Spain, including obtaining confidential business plans and information about promoting sales and marketing the products, Suavinex voluntarily and contractually limited its ability to use or copy LNC's product design information."  "The fact that this agreement prevented [Suavinex] from using information that it previously [could have] gleaned by reverse engineering is irrelevant.  Parties to a contract may limit their right to take action they previously had been free to take." *Universal Gym Equip., Inc. v. ERWA Exercise Equip. Ltd.*, 827 F.2d 1542, 1550 (Fed. Cir. 1987); *see also Byrne v. Sealy & Co.*, 742 So. 2d 668, 671 (La. App. 5th Cir. 1999) ("There is nothing that prohibits or prevents a party from contractually agreeing to greater liability than would have been provided by law.").

Moreover, as LNC contends, it makes little sense to incorporate U.S. intellectual property law principles into the parties' contract, which concerns the sale of products outside of the United States.  U.S. intellectual property law applies only to products manufactured in, sold in, offered for sale in, or imported to the United States.  35 U.S.C. § 154(a)(1); *Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437, 454-55 (2007).  Although jurisdictions outside of the United States recognize other forms of intellectual property rights, there is no

indication that LNC ever intended to obtain intellectual property protection for products distributed worldwide through its network of distributors like Suavinex. Instead LNC asserts that it sought extraterritorial protection of its product designs through distribution agreements, such as the one at issue here, and insisted on the survival of these obligations in the Termination Agreement, which was executed by both parties after arm's-length negotiation.

Examining Paragraph 15 as whole further demonstrates that Subsection B relates to information that is not intellectual property-protected. The heading of Paragraph 15, "**Intellectual Property Rights and LNC's Product Design and Packaging**," indicates that Paragraph 15 concerns both LNC's "intellectual property rights" *and* LNC's "product design and packaging." Unlike Subsection B, Subsection A exclusively concerns LNC's intellectual property rights, specifically LNC's Trademarks.[6] The provision imposes certain obligations and restrictions on the Distributor in relation to

---

[6] Paragraph 15A states:

Distributor hereby acknowledges that the Trademarks that are or become subject to this Agreement, and any combinations thereof are good and valid between the parties and that Distributor will not challenge their validity or ownership during the term of this Agreement or thereafter. Distributor further acknowledges and hereby agrees that LNC has the exclusive rights in the Territory to the use of the Trademarks, trade names and brand names (including but not limited to, LNC's rights in connection with advertising materials, copyrighted packaging and/or other related materials associated with the Products), and that Distributor has no right or interest therein or in any other trademark, trade name, or brand name of LNC and/or Nûby or its Licensors. Furthermore, Distributor acknowledges that LNC and Nûby under a Trademark License Agreement (a license agreement with Admar International Inc. and/or N.E. Hakim for certain Nûby Trademarks) has licensed those certain Trademarks in Exhibit I for use within the Territory. Distributor will not in any way infringe or contribute to the infringement by others of the rights of LNC and or Nûby in said Trademarks, trade name and brand name, but will immediately notify LNC upon suspecting or learning of such infringement by others in the Territory. Distributor will only use the Trademarks in a manner approved by LNC. LNC shall be responsible for protection and maintenance of the Trademarks. Distributor may use its own trademarks at its discretion on all non-LNC or Nûby Products.

those marks.  For example, the Distributor may not "challenge their validity or ownership," "has no right or interest" in them, "will not in any way infringe or contribute to the infringement by others of the . . . Trademarks," and "will immediately notify LNC upon suspecting or learning of such infringement by others in the Territory."  Subsection A does not contain the words "product design" at all.  It refers once to packaging, but specifically "*copyrighted* packaging."

Subsection B, at issue in this litigation, contains the aforementioned list of product-related information, including LNC's product design and packaging, without a similar qualification that they be copyrighted.  And the Distributor "agrees not to copy or utilize any of [this information] . . . without LNC's written permission."

Subsection C provides LNC's remedies if the Distributor violates subsection A or B.  The provision states in full:

> C. If in the event, the Distributor is found to have copied any **Intellectual Property Rights, Product Designs and/or Packaging as defined in Paragraph 15 A & B above**, then the Distributor will be liable to pay to LNC, at a minimum, a royalty of twelve (12) percent on all sales of the infringing product(s) as well as any other remedies allowed by law for LNC to recover its losses and lost sales.

Subsection C finally draws the link between "Intellectual Property Rights" and "Products Designs and/or Packaging."  The logical inference is that the former is defined in subsection A, whereas the latter is defined in subsection B.  Construing the term "product design" in subsection B merely as a subset of LNC's intellectual property rights, as the district court did, ignores the relationship between each subsection of Paragraph 15 and subverts the meaning of the provision as a whole, in contravention of La. Civ. Code Ann. art. 2050.

No. 16-30039

We observe that sometimes contractual provisions are used merely to acknowledge rights already established so as to limit the set of rights and remedies to which the contract applies.  Paragraph 15A provides an example. That provision discusses LNC's trademarks, which the Distributor acknowledges, *inter alia*, that it "has no right or interest therein."  This acknowledgement serves merely to confirm rights LNC already has and Suavinex does not.  Paragraph 15B, however, is not limited on its face to the parties' established rights.  While Paragraph 15A provides that LNC has "exclusive rights" to the use of LNC's "copyrighted packaging," Paragraph 15B requires the Distributor to agree "not to copy or utilize any of LNC's . . . packaging," thereby extending contractual protection to LNC's packaging that is *not* copyrighted.  And Paragraph 15B extends that same protection to "any of LNC's . . . product design."

Suavinex raises various counter arguments, none of which are persuasive.[7]  First, Sauvinex argues that the Paragraphs 15B and 19 only apply to "proprietary" information, which the District Court concluded is limited to "information in which the owner has a protectable interest."  Even assuming the district court correctly inferred that the word "proprietary"— which appears only in the catch-all phrase at the end of the list of items in each provision—implicitly modifies every other item on the list, LNC asserts that the term "proprietary" refers simply to information that it originally conceived, such as the innovative designs of the baby products at issue in this case, which

---

[7] We note that Suavinex concedes that the district court's statement that Louisiana law would prevent enforcement of a contract protecting *non*-confidential information is not supported by the decisions the district court cited.  Suavinex acknowledges that these cases are merely examples of where a non-disclosure agreement prohibiting the use of confidential information was breached through the use of confidential information. We likewise do not discern in these cases any general principle of Louisiana contract law that precludes enforcement of express agreements not to disclose or make use of *non*-confidential information as well as confidential information.

were in LNC's sole possession prior to the dissemination of the products to the public. This common-sense meaning of "proprietary" is both reasonable and more consistent with the meaning of the contract as a whole.

Second, Suavinex contends that LNC's interpretation attempts to rewrite the contract into the language of the contract in *Universal Gym Equipment, Inc. v. ERWA Exercise Equipment Ltd.*, 827 F.2d 1542 (1987), which the Federal Circuit interpreted in substantively the same manner as we construe the contract at issue here. That case concerned a licensing agreement authorizing Global Gym and Equipment Fitness Limited ("Global"), a subsidiary of ERWA Exercise Equipment Limited, to manufacture and sell the "Universal machine" that Universal Gym Equipment, Inc. ("Universal") invented, in exchange for royalty payments. *Id.* at 1550. The contract also provided that after termination of the agreement, Global "shall not thereafter manufacture, use, sell, or distribute any products which include any of the features, designs, [or] technical information" of Universal. *Id.* at 1545. Like Suavinex, Global argued that "because the agreement did not define 'features and designs,' those items must be limited to 'confidential proprietary information' that Universal supplied to Global." *Id.* at 1550. The Federal Circuit held that "the broad language . . . prohibiting Global from using 'any of the' features and designs of Universal meant what it said and was not limited to the use of whatever confidential or proprietary information Universal may have supplied to Global." *Id.* at 1551. We similarly interpret the explicit prohibition against copying "any of LNC's . . . product design" to mean what it says and, as discussed above, reject the notion that the term "proprietary" limits the scope of Paragraph 15B to designs that are intellectual property-protected.

Suavinex also contends that *Universal Gym Equipment* is distinguishable because it expressly prohibited the use of product "features" as

well as product "designs," unlike the instant contract, which only prohibits copying LNC's "product design." Suavinex contends that, at most, LNC alleges that Suavinex copied certain design features of LNC's products. The district court did not address this argument and we make no observation as to whether there is a meaningful difference between copying *features* of a "product design" and copying a "product design" for purposes of determining breach of the Termination Agreement. On remand, Suavinex may address this argument directly to the district court.[8]

Further, we draw no conclusion as to whether Suavinex did, in fact, copy LNC's product designs, in violation of the Termination Agreement. These are questions of fact requiring an examination of the summary judgment record that the district court did not undertake. We remand to the district court to determine, in the first instance, whether these factual issues can be resolved on summary judgment.

### C. Injunctive Relief

The district court's judgment that LNC was not entitled to an injunction was premised entirely on its conclusion that the Termination Agreement did not reach the products at issue, and therefore that Suavinex did not breach the agreement. Accordingly, reversing the district court's judgment on LNC's breach of contract claim requires that we reverse the district court's denial of injunctive relief as well. We take no position on the merits of whether LNC is entitled under Louisiana state law to the injunctive relief it seeks.

---

[8] We likewise decline to address any other issues raised by the parties that the district court did not pass upon. *See Singleton v. Wulff*, 428 U.S. 106, 120 (1976) ("It is the general rule, of course, that a federal appellate court does not consider an issue not passed upon below.").

No. 16-30039

**D. Attorney's Fees**

Reversal on the breach of contract claim likewise requires vacation of the attorney's fees award to Sauvinex.  It is premature at this juncture to conclude which party will be the "prevailing party," entitled to reasonable attorney's fees under Paragraph 5.9 of the Termination Agreement.

## III.    CONCLUSION

In sum, we REVERSE the district court's judgment on LNC's breach of contract claim and its request for injunctive relief.  We VACATE the award of attorney's fees to Suavinex.  And we REMAND the case to the district court for further proceedings consistent with this opinion.