868 F.2d 1226
 9 U.S.P.Q.2d 1913
 Donald G. RICHARDSON, Plaintiff/Appellant,
v.
SUZUKI MOTOR CO., LTD. and U.S. Suzuki Motor Corporation,
Defendants/Cross- Appellants,
Kawasaki Heavy Indust. Ltd., Kawasaki Motors Corp., Yamaha
Motor Co., Ltd., Yamaha Motor Corp., U.S.A.,
Kayaba Industry Co., Ltd. and Kayaba
Industry Co., Defendants.
 Nos. 87-1497, 87-1498, 87-1502, 88-1083 and 88-1084.
 United States Court of Appeals,
Federal Circuit.
 Feb. 16, 1989.
Rehearing Denied March 29, 1989.
Suggestion for Rehearing In Banc Declined May 4, 1989.
 
 Theresa A. Middlebrook, Wagner & Middlebrook, Glendale, Cal., and Robert W. Driscoll, Driscoll & Tomich, San Marino, Cal., argued for plaintiff/appellant. With them on the brief was John E. Wagner.
 John A. Fogarty, Kenyon & Kenyon, New York City, argued for defendants/cross-appellants. With him on the brief were Richard S. Gresalfi and Dawn M. DiStefano. Also on the brief were Richard S. Rockwell, Tustin, Cal., Duffern H. Helsing and Halina F. Osinski, Santa Ana, Cal., of counsel.
 Before SMITH, Circuit Judge, SKELTON, Senior Circuit Judge, and NEWMAN, Circuit Judge.
 PAULINE NEWMAN, Circuit Judge.
 
 
 1
 This appeal and cross-appeal are from the judgment of the United States District Court for the Central District of California, and involve issues of patent validity, infringement, breach of contract, fraud, misappropriation of trade secrets, and several related issues.[1] We affirm in part, reverse in part, vacate in part, and remand.
 
 The Invention
 
 2
 The invention that led to this litigation is a motorcycle rear-wheel suspension system that smooths the ride over rough terrain, of interest particularly in off-road motorcycle riding. The roughness of the ride is due to bumps and dips in the terrain, transmitted from the wheels to the frame. An optimum rear-wheel suspension will maintain tire contact with the ground despite deflection by irregularities, will avoid "bottoming out" (an unsafe rising of the suspension), yet will achieve a smooth ride without reduction in safety. In 1974 even the best available suspensions did not maintain adequate tire contact with the ground in conjunction with attempts to eliminate bottoming out.
 
 
 3
 In mid-1974 Donald G. Richardson, a young mechanic in California, devised a solution to the problem, a modified suspension system that he installed in his own motocross motorcycle. Richardson replaced the conventional two-spring shock absorber suspension system with a system consisting of a single shock absorber plus a linkage consisting of a bell crank and connecting rod. This linkage generated a "rising rate"[2]--a characteristic critical to the issue--and produced a far superior ride, even as it eliminated the dangerous bottoming out. Richardson testified about his first ride, at a hilly construction site near his house, as "utopia. I mean it was incredible"; over hard bumps it was "uncanny because it was so smooth"; "[t]he rear end didn't kick up. It just didn't bottom out and stayed down"; an "unbelievable feeling".
 
 
 4
 On November 25, 1974 Richardson filed a United States patent application on his invention, and on September 23, 1975 the application issued as United States Patent No. 3,907,332 (hereinafter the '332 or Richardson patent). Patent claim 9, which incorporates claim 1, is the only claim in suit. Claims 1 and 9 follow:
 
 
 5
 1. A suspension for two wheeled vehicles comprising:
 
 
 6
 a frame for the vehicle comprising a generally closed shape including upper and lower portions and
 
 
 7
 a swing arm pivotally connected to the lower portion of said frame;
 
 
 8
 said swing arm comprising a pair of arms rotatably supporting a wheel about a horizontal axis generally at the end of said swing arm;
 
 
 9
 the pivotal mounting of said arm to said frame being about a generally horizontal axis whereby said wheel is both rotatable about its own horizontal axis and deflectable in a generally vertical direction about the axis of said swing arm;
 
 
 10
 spring means having a first end pivotally secured to said frame;
 
 
 11
 a link member including an intermediate point pivotally mounted on said frame about an axis, parallel to the axis of said swing arm at a point spaced therefrom;
 
 
 12
 pivotal connection means between said link member and the second end of said spring;
 
 
 13
 a bar pivotally connected at one end to said swing arm and at the opposite end to said link member at a position spaced from said spring connection;
 
 
 14
 said spring, bar, swing arm and link connected whereby deflection of said swing arm displaces said bar and rotates said link member to compress said spring.
 
 
 15
 9. The combination in accordance with claim 1 wherein said assembly provides a rising spring rate as a function of deflection of said swing arm.
 
 
 16
 Figure 2 of the '332 patent specification is illustrative:
 
 
 17
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLEAs the rear wheel is deflected upward by bumps in the terrain, the swing arm (32) that is pivotally connected at (34) to the motorcycle frame (21) rotates upward, pushing the compression rod (41) into the bell crank (42) that is pivotally secured (31) at its intermediate point to the motorcycle frame. The bell crank rotates on its pivot (31) and compresses, downward against the frame, a spring (46) that is pivotally connected at one end (45) to the bell crank, and at its other end (52) to the motorcycle frame. The interaction of these interconnected parts increases the force on the spring, increasing the rate of resistance to deflection of the wheel with increased movement of the wheel. This varying resistance is the "rising spring rate" of claim 9, and is illustrated in Figure 5 of the '332 patent:
 
 
 18
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLEThe Contract with Suzuki
 
 
 19
 In October 1978 Richardson entered into a one year Option and License Agreement with the Suzuki Motor Co., Ltd. of Japan ("Suzuki").
 
 
 20
 The Agreement gave Suzuki the exclusive right to test and evaluate Richardson's suspension, and the exclusive option to acquire an exclusive license to the '332 patent and Richardson's "proprietary technical information, know-how, inventions, and use data", collectively defined in the Agreement as the "Licensed Rights."
 
 
 21
 The Agreement required Richardson to disclose to Suzuki all technical information, know-how, inventions, use data and design specifications for his suspension, that he possessed or that he acquired during the option period. Suzuki agreed to preserve all such information in confidence, and not to use any of it "for any purpose other than to evaluate for commercial feasibility of manufacture and marketing during the Option Period." Suzuki agreed that this obligation of confidence continued if Suzuki did not exercise the option. Excepted from the confidentiality obligation was all information previously known to Suzuki or at any time generally known to the public.
 
 
 22
 The Agreement required Richardson to make prototypes of his suspension system for Suzuki's evaluation. Richardson installed his suspension in Suzuki's sample 1978 and 1979 model production motorcycles, and disclosed to Suzuki the technical information and know-how that he possessed, including improvements and other information that he developed during this period. He met frequently with Suzuki engineers and other Suzuki personnel in the United States and in Japan to communicate this information and generally to improve performance and to facilitate testing and evaluation.
 
 
 23
 There was testimony at trial of initial incredulity on the part of Suzuki engineers concerning Richardson's suspension, of Suzuki's past failures in designing a suspension with the desired characteristics, and of Suzuki's favorable response to the performance of Richardson's suspension. The evidence included internal Suzuki documents made while Suzuki was testing Richardson's suspension, stating that it would "take a long time", perhaps three years, for Suzuki to develop a satisfactory suspension.
 
 
 24
 In early 1979 Richardson and a colleague Cazort conceived an improvement in the linkage-generated rising rate suspension, which they called the "Alternate Shock Mount" and which they disclosed to Suzuki, accompanied by drawings and blueprints made by Cazort. The difference from the structure described in the '332 patent is that in the Alternate Shock Mount the lower end of the spring is pivotally secured to the swing arm which is pivotally secured to the frame, instead of being pivotally secured directly to the frame, resulting in increased strength.
 
 
 25
 In May 1979 Richardson's first prototype for Suzuki, wherein Richardson, aided by Cazort, installed his suspension in a Suzuki 1978 production model, was successfully tested in Japan. Testimony at trial included statements attributed to Suzuki's test riders that they could see the bumps but not feel them, and other commentary evidencing a highly favorable reaction to Richardson's suspension.
 
 
 26
 It was a stipulated fact that after these tests Suzuki made the decision to place the linkage-generated rising rate suspension system into production, and started development work for this purpose.
 
 
 27
 On October 16, 1979 Suzuki filed a patent application in Japan. The corresponding United States patent, filed on October 8, 1980, claims the Alternate Shock Mount suspension as disclosed by Richardson, and also claims a modification made by Suzuki called the "criss-cross". Suzuki named two of its engineers, Hirohide Tamaki and Manabu Suzuki, as the inventors.
 
 
 28
 Suzuki twice requested and was granted one-month extensions of its Option and License Agreement with Richardson. In December 1979 Suzuki informed Richardson that it would not exercise the option.
 
 
 29
 In March 1980 Suzuki began competitive racing in the United States of Suzuki motorcycles using the Alternate Shock Mount suspension, which Suzuki named the "Full Floater". Suzuki met with marked racing success, the Full Floater receiving favorable publicity and high acclaim from the public. Extensive advertising was directed to the Full Floater rising rate suspension. The product achieved widespread commercial success.
 
 
 30
 Suzuki denied any obligation to Richardson.
 
 Litigation
 
 31
 Richardson brought suit against Suzuki (Japan) and the U.S. Suzuki Motor Corporation in California state court, and was granted a preliminary injunction restraining the Suzuki companies from breach of the Option and License Agreement and requiring them to comply with the confidentiality terms thereof. At Suzuki's request the state court declined to enforce the injunction after U.S. Suzuki sued Richardson in federal court, seeking a declaratory judgment of invalidity and non-infringement of Richardson's '332 patent.
 
 
 32
 In 1982 Richardson filed a patent infringement action against the Suzuki companies and others. (Only the Suzuki companies remain as parties.) Richardson reasserted the state claims of breach of contract, breach of implied covenant of good faith and fair dealing, misappropriation of trade secrets, and fraud, and among other relief requested assignment of the patents obtained by Suzuki on the Alternate Shock Mount. Suzuki counterclaimed for fraud and breach of contract by Richardson, based on asserted invalidity of the '332 patent.
 
 
 33
 The federal actions were consolidated and tried to a jury. After forty-seven days of a two-part trial the jury gave special verdicts on issues of liability and damages. The district court entered final judgment under Fed.R.Civ.P. 54(b) on the jury verdicts that the '332 patent was not invalid and was infringed by Suzuki, that nine of Richardson's eleven asserted trade secrets were not trade secrets, and that Richardson was not entitled to assignment of the Tamaki/Suzuki patents on the Alternate Shock Mount. The court also entered final judgment on the jury verdicts of damages for patent infringement and for Suzuki's use of certain of Richardson's information that the jury found were not trade secrets. The court denied prejudgment interest and attorney fees, and refused to grant an injunction.
 
 
 34
 The district court denied most of the parties' post-trial motions, but granted Suzuki's motion for a new trial on three issues that the jury had decided in favor of Richardson, upholding two of the eleven asserted trade secrets, finding fraud on the part of Suzuki, and assessing damages for fraud. The district court then entered a supplemental final judgment for immediate appeal of the issues that the court intended to retry, and certified three specific questions on these and related issues.
 
 
 35
 * Validity of Richardson's '332 Patent
 
 
 36
 Suzuki asserts on appeal the invalidity of claim 9 on grounds of anticipation (35 U.S.C. Sec. 102) and obviousness (35 U.S.C. Sec. 103).[3] The district court, stating that questions of patent validity must be decided by the court, told the jury that its verdicts on this issue were advisory. Nevertheless the court duly entered the jury verdicts, including the answer YES to the question: "Under the facts and law as you believe that you understand them, do you find Claim 9 of the Richardson Patent to be valid?" The court entertained, and denied, post-trial motions for judgment n.o.v. and for a new trial on the question of validity. The court also independently decided the question, upholding validity of the '332 patent.
 
 
 37
 The record provided to us doesn't show the origin of this discredited procedure of advisory verdicts, or whether either party objected. In Perkin-Elmer Corp. v. Computervision Corp., 732 F.2d 888, 895 n. 5, 221 USPQ 669, 674 n. 5, (Fed.Cir.), cert. denied, 469 U.S. 857, 105 S.Ct. 187, 83 L.Ed.2d 120 (1984), we observed that:
 
 
 38
 The view suggested in Sarkisian [v. Winn-Proof Corp., 688 F.2d 647, 651, (9th Cir.1982), cert. denied, 460 U.S. 1052 [103 S.Ct. 1499, 75 L.Ed.2d 930] (1983) ], that a jury verdict on nonobviousness is at best advisory, would make charades of motions for directed verdict or JNOV under Fed.R.Civ.P. 50 in patent cases. These motions apply only to binding jury verdicts....
 
 
 39
 Moreover, use of an advisory jury is limited to actions not triable of right by a jury.
 
 
 40
 (emphasis in original, citations omitted). In a similar circumstance wherein the trial court and the jury independently decided the same jury question (in that case the question of willfulness of infringement) we remarked that "[a]ll fact findings of a jury are non-advisory, unless made in an area expressly removed from jury verdict." Shiley, Inc. v. Bentley Laboratories, Inc., 794 F.2d 1561, 1568, 230 USPQ 112, 115 (Fed.Cir.1986), cert. denied, 479 U.S. 1087, 107 S.Ct. 1291, 94 L.Ed.2d 148 (1987).
 
 
 41
 It is established that the jury may decide the questions of anticipation and obviousness, either as separate special verdicts or en route to a verdict on the question of validity, which may also be decided by the jury. Connell v. Sears, Roebuck & Co., 722 F.2d 1542, 1547, 220 USPQ 193, 197 (Fed.Cir.1983):
 
 
 42
 No warrant appears for distinguishing the submission of legal questions to a jury in patent cases from such submissions routinely made in other types of cases. So long as the Seventh Amendment stands, the right to a jury trial should not be rationed, nor should particular issues in particular types of cases be treated differently from similar issues in other types of cases.
 
 
 43
 See also, e.g., Vieau v. Japax, Inc., 823 F.2d 1510, 1515, 3 USPQ2d 1094, 1098 (Fed.Cir.1987); Verdegaal Brothers Inc. v. Union Oil Co. of California, 814 F.2d 628, 631, 2 USPQ2d 1051, 1052 (Fed.Cir.), cert. denied, --- U.S. ----, 108 S.Ct. 95, 98 L.Ed.2d 56 (1987); Data Line Corp. v. Micro Technologies, Inc., 813 F.2d 1196, 1200, 1 USPQ2d 2052, 2054 (Fed.Cir.1987); Orthokinetics, Inc. v. Safety Travel Chairs, Inc., 806 F.2d 1565, 1571, 1 USPQ2d 1081, 1085 (Fed.Cir.1986); DMI, Inc. v. Deere & Co., 802 F.2d 421, 425-27, 231 USPQ 276, 279-80 (Fed.Cir.1986); Mainland Industries, Inc. v. Standal's Patents Ltd., 799 F.2d 746, 747-48, 230 USPQ 772, 773 (Fed.Cir.1986); Trans-World Mfg. Corp. v. Al Nyman & Sons, Inc., 750 F.2d 1552, 1560, 224 USPQ 259, 263 (Fed.Cir.1984); Quaker City Gear Works, Inc. v. Skil Corp., 747 F.2d 1446, 1454-55, 223 USPQ 1161, 1165-66 (Fed.Cir.1984), cert. denied, 471 U.S. 1136, 105 S.Ct. 2676, 86 L.Ed.2d 694 (1985); Weinar v. Rollform Inc., 744 F.2d 797, 805, 223 USPQ 369, 372 (Fed.Cir.1984), cert. denied, 470 U.S. 1084, 105 S.Ct. 1844, 85 L.Ed.2d 143 (1985); Perkin-Elmer Corp., 732 F.2d at 894-95, 221 USPQ at 674; Envirotech Corp. v. Al George, Inc., 730 F.2d 753, 758, 221 USPQ 473, 477 (Fed.Cir.1984); Railroad Dynamics, Inc. v. A. Stucki Company, 727 F.2d 1506, 1512-13, 220 USPQ 929, 935 (Fed.Cir.), cert. denied, 469 U.S. 871, 105 S.Ct. 220, 83 L.Ed.2d 150 (1984); White v. Jeffrey Mining Mach. Co., 723 F.2d 1553, 1558, 220 USPQ 703, 705 (Fed.Cir.1983) ("Submission of such a question of law [obviousness] to a jury, accompanied by appropriate instructions, is proper."), cert. denied, 469 U.S. 825, 105 S.Ct. 104, 83 L.Ed.2d 49 (1984). See generally H.T. Markey in On Simplifying Patent Trials, 116 F.R.D. 369, 370 (1987) ("There is neither reason nor authority for employing in a patent trial procedures and practices different from those employed in any other civil trial. Indeed, reason and authority mandate the contrary.")
 
 
 44
 Although the district court and the jury reached the same result, the standards by which appellate courts review the judgment differ, depending on whether it arose from a jury or a bench trial. District of Columbia v. Pace, 320 U.S. 698, 701, 64 S.Ct. 406, 408, 88 L.Ed. 408 (1944) ("findings of fact by an equity court and the verdict of a jury have from time immemorial been subject to different rules of finality"). When the judgment arises from a jury verdict, the reviewing court applies the reasonable jury/substantial evidence standard: a standard that gives greater deference to the judgment simply because appellate review is more limited, compared with review of a trial judge's decision. Id. at 702, 64 S.Ct. at 408. As summarized in Lavender v. Kurn, 327 U.S. 645, 653, 66 S.Ct. 740, 744, 90 L.Ed. 916 (1946), "the appellate court's function is exhausted when that evidentiary basis [of the jury's verdict] becomes apparent, it being immaterial that the court might draw a contrary inference or feel that another conclusion is more reasonable." See generally M.B. Louis, Allocating Adjudicative Decision Making Authority Between the Trial and Appellate Levels: A Unified View of the Scope of Review, The Judge/Jury Question, and Procedural Discretion, 64 N.C.L.Rev. 993 (1986).
 
 
 45
 The parties do not take a position on the district court's procedure, but appear to recognize that the issue of validity was properly for jury determination, for neither party refers to the district court's explanation of its independent determination of the question of obviousness.
 
 
 46
 In the interest of reaching an end to this protracted litigation, we have reviewed the judgment on the terms on which it reaches us. We have determined first whether Suzuki met its burden of showing on appeal that no reasonable jury could have reached the verdict of "valid" on the evidence before it. Allen Organ Co. v. Kimball Int'l, Inc., 839 F.2d 1556, 1566, 5 USPQ2d 1769, 1777 (Fed.Cir.), cert. denied, --- U.S. ---, 109 S.Ct. 132, 102 L.Ed.2d 104 (1988); DMI, Inc. v. Deere & Co., 802 F.2d 421, 425, 231 USPQ 276, 278 (Fed.Cir.1986); Shatterproof Glass Corp. v. Libbey-Owens Ford Co., 758 F.2d 613, 618-19, 225 USPQ 634, 636 (Fed.Cir.), cert. dismissed, 474 U.S. 976, 106 S.Ct. 340, 88 L.Ed.2d 326 (1985). Then, on the premise that the parties may have waived their right to a jury trial on this question by failure to object to the district court's procedure, we have considered whether the district court's independent judgment of validity may be sustained, on the standards applicable thereto. Panduit Corp. v. Dennison Mfg. Co., 810 F.2d 1561, 1566-68, 1 USPQ2d 1593, 1595-97 (Fed.Cir.) (obviousness determination in bench trial reviewed as a question of law based on underlying facts), cert. denied, 481 U.S. 1052, 107 S.Ct. 2187, 95 L.Ed.2d 843 (1987).
 
 
 47
 The court correctly instructed the jury that invalidity must be proved by clear and convincing evidence, referring to the presumption of validity. Perkin-Elmer Corp., 732 F.2d at 894, 221 USPQ at 674; Jamesbury Corp. v. Litton Industrial Products, Inc., 756 F.2d 1556, 1559, 225 USPQ 253, 255 (Fed.Cir.1985); American Hoist & Derrick Co. v. Sowa & Sons, Inc., 725 F.2d 1350, 1360, 220 USPQ 763, 771 (Fed.Cir.), cert. denied, 469 U.S. 821, 105 S.Ct. 95, 83 L.Ed.2d 41 (1984).
 
 A. Anticipation
 
 48
 The district court correctly instructed the jury that an invention is anticipated if the same device, including all the claim limitations, is shown in a single prior art reference. Every element of the claimed invention must be literally present, arranged as in the claim. Perkin-Elmer Corp., 732 F.2d at 894, 221 USPQ at 673; Kalman v. Kimberly-Clark Corp., 713 F.2d 760, 771-72, 218 USPQ 781, 789 (Fed.Cir.1983), cert. denied, 465 U.S. 1026, 104 S.Ct. 1284, 79 L.Ed.2d 687 (1984). The identical invention must be shown in as complete detail as is contained in the patent claim. Jamesbury Corp., 756 F.2d at 1560, 225 USPQ at 256; Connell, 722 F.2d at 1548, 220 USPQ at 198.
 
 
 49
 As prior art, Suzuki relied on the motorcycle suspensions described in certain patents to Downs and Warner, and on the race car wheel suspensions described for Tyrrell and McLaren race cars in two Road and Track magazine articles. Witnesses explained to the jury the similarities and differences between the invention of the '332 patent and each prior art reference. For example, the Downs suspension has a spring element that is rigidly attached to the motorcycle frame and does not pivot as is required by claim 9 of the '332 patent. The Warner reference shows a suspension having a bell crank that is pivotally mounted to the motorcycle frame but not at an intermediate point, whereas Richardson requires a mid-point pivot of the bell crank to the frame. Neither Downs nor Warner describes a rising rate. The magazine articles describe a four wheel racing car suspension system having a linkage-generated variable rising rate incorporating a bell crank, but instead of the swing arm of Richardson's motorcycle suspension, the race car systems use an A-shaped arm mounted to the side of an upright wheel; and the bell crank and linkage in the race car system is located beside the wheel, rather than in front of the wheel as in Richardson's motorcycle system.
 
 
 50
 Witnesses testified that rising rate in motorcycles had previously been obtained only by progressively wound springs and gas operated shock absorbers. Suzuki argued that rising rate is inherent in the Downs and Warner motorcycle suspensions and expressly described for race cars in the magazine articles, and also that rising rate is merely a statement of function, and thus should not be a basis for distinction from the prior art.
 
 
 51
 The jury found that Downs did not "disclose each and every element of the Richardson Claims 1 and 9 or their equivalent". For the Warner reference, the jury could not reach a unanimous verdict on this same question, but answered NO to the question whether "the respective elements of Warner function in substantially the same way as the corresponding elements in Richardson to produce substantially the same results". The jury found that the race car suspensions did "disclose each and every element of the Richardson Claims 1 and 9 or their equivalent", but did not reach a unanimous verdict as to whether they "function in substantially the same way as the corresponding elements in Richardson to produce substantially the same results."
 
 
 52
 The jury had erroneously been instructed that anticipation may be shown by equivalents, a legal theory that is pertinent to obviousness under Section 103, not to anticipation under Section 102. Lewmar Marine, Inc. v. Barient, Inc., 827 F.2d 744, 747-48, 3 USPQ2d 1766, 1768 (Fed.Cir.1987), cert. denied, --- U.S. ----, 108 S.Ct. 702, 98 L.Ed.2d 653 (1988); Connell, 722 F.2d at 1548, 220 USPQ at 198. The jury requested a definition of "equivalent" during its deliberations, and was given the Webster's dictionary definition "corresponding or virtually identical, especially in effect or function." This narrow definition, which does not accord with that of Graver Tank & Mfg. Co. v. Linde Air Products Co., 339 U.S. 605, 608, 70 S.Ct. 854, 856, 94 L.Ed. 1097 (1950), may have minimized the legal error in the instructions. In any event, the erroneous inclusion of equivalents in the anticipation inquiry favored Suzuki. The jury nonetheless answered YES to the special verdict: "Under the facts and law as you believe that you understand them, do you find Claim 9 of the Richardson Patent to be valid?"
 
 
 53
 On the totality of the evidence and in light of the jury instructions and answers, we conclude that a reasonable jury could have found that the patent was not invalid on grounds of anticipation. Perkin-Elmer Corp., 732 F.2d at 894, 221 USPQ at 673-74 (review of presumed jury finding that anticipation not proved, based on jury verdict of validity).
 
 
 54
 Reviewing the analysis and decision of the district court, based on the same prior art, we discern no clear error in the court's conclusion that claim 9 was not invalid.
 
 
 55
 We affirm that claim 9 was not proved invalid on the ground of anticipation.
 
 B. Obviousness
 
 56
 The issue of obviousness was vigorously litigated, Suzuki relying on the same Downs and Warner patents and magazine articles. The record shows that there was extensive testimony concerning the differences between Richardson's suspension and the prior art. Suzuki argued at trial, and repeats on this appeal, that these differences are trivial mechanical expedients.
 
 
 57
 The jury, among its special verdicts on the Graham factors, found that a person of ordinary skill in the pertinent art could be any of: (1) a motorcycle mechanic without formal technical education, (2) a person with experience in working on suspension systems for racing automobiles, but without formal technical training, (3) suspension system instructors, (4) professional motorcycle riders, and (5) someone possessing above-average mechanical skills. Suzuki argues that such a person is of generally high mechanical skill, and to such a person Richardson's rising rate motorcycle suspension would have been an obvious "adaption" of the race car suspension systems, which "suggests itself quite plainly, since Downs and Warner incorporate bell cranks in their respective suspensions."
 
 
 58
 The jury was unable to reach a unanimous verdict on the question of whether a person of the level of skill found by the jury, presented with the problem and being familiar with all the prior art including these four specific references, but unaware of Richardson's device, would be "led to do" what Richardson did. In response to the ultimate question, as we have observed, the jury reached the unanimous verdict that "Under the facts and law as you believe that you understand them", claim 9 was "valid". The district court entered judgment on the jury verdicts, independently held the patent valid, and denied Suzuki's motions for judgment n.o.v. and for a new trial on the issue of validity.
 
 
 59
 The question for the jury was whether the challenger met the burden of proving invalidity by clear and convincing evidence; and the question on review is whether reasonable jurors could have concluded that the challenger failed to meet that burden. Orthokinetics, Inc. v. Safety Travel Chairs, Inc., 806 F.2d 1565, 1571, 1 USPQ2d 1081, 1085 (Fed.Cir.1986); Perkin-Elmer Corp., 732 F.2d at 894-95, 221 USPQ at 674. The jury's lack of unanimity on certain special verdicts can reasonably be taken to mean, as the district court held, that invalidity had not been proved by clear and convincing evidence.
 
 
 60
 Our review shows that there was substantial evidence on which reasonable jurors could have concluded that claim 9 had not been proved invalid for obviousness, and thus reached the verdict of "valid". Although the district court erred in its belief that obviousness could only be presented to the jury for an advisory verdict, we may view the court's agreement with the jury verdict of validity as supporting the court's denial of Suzuki's post-trial motions for judgment n.o.v. and for a new trial. Perkin-Elmer Corp., 732 F.2d at 895, 221 USPQ at 674-75. However it is viewed procedurally, no reversible error has been shown in the court's conclusion that obviousness had not been proved and that claim 9 was not invalid.
 
 
 61
 The judgment of validity is affirmed.
 
 II
 Infringement
 
 62
 Richardson bore the burden of proving infringement by a preponderance of the evidence. The district court correctly stated that the jury was the finder of the fact of infringement.
 
 
 63
 The jury rendered special verdicts as to the Suzuki motorcycles before it, Model M having the Richardson/Cazort Alternate Shock Mount and Model C having the "criss-cross" connection added by Suzuki, as follows:
 
 
 64
 9(a). Do defendant Suzuki's motorcycles of the Model M type ... infringe Claim 9 of the plaintiff's patent?
 
 Answer: YES, WITH THE RISING RATE
 
 65
 9(b). Do defendant Suzuki's motorcycles of the Model C type ... infringe Claim 9 of the plaintiff's patent?
 
 Answer: YES, WITH THE RISING RATE
 
 66
 In subparts 9(a)(2) and 9(b)(2) of the special verdict the jury answered YES to the question whether the Suzuki motorcycles produce substantially the same rising rate as taught in Richardson's patent.
 
 
 67
 The principal question on appeal is the meaning and effect of the jury answers to subparts (1) of the special verdict, which were directed "in particular" to the Alternate Shock Mount and the criss-cross modifications:
 
 
 68
 9(a)(1). In particular, is the defendant's linkage equivalent to the plaintiff's, bearing in mind that the bottom of the spring in the former is affixed to the swing arm rather than to the frame?
 
 Answer: NO
 
 69
 9(b)(1). In particular, is the defendant's linkage equivalent to the plaintiff's, in light of the "criss-cross" of the connecting rods and the bell crank in the defendant's model, as well as the spring attachment to the swing arm, as compared with the plaintiff's Claim 9?
 
 Answer: NO
 
 70
 The district court entered judgment of infringement in favor of Richardson and denied post-trial motions by both sides, including a motion by Richardson to reopen the record in order to present evidence on the doctrine of equivalents. The district court stated that the jury verdicts mean that "infringement is limited to 'rising rate' " and that the Suzuki and Richardson linkages are not equivalent.
 
 
 71
 Suzuki argues that special verdicts 9(a)(1) and 9(b)(1) require judgment of non-infringement; or, as a minimum, that these verdicts are inconsistent with the verdicts of infringement in 9(a) and 9(b), such that a new trial is required of the entire issue. Richardson states that the verdicts can be understood, when viewed in light of the jury instructions, in a way that supports the judgments of infringement. Suzuki did not request a new trial on the basis of inconsistent verdicts at the time the judgments were entered, while Richardson moved, unsuccessfully, to amend or delete verdicts 9(a)(1) and 9(b)(1). Each party asserts that any inconsistency should be resolved in its favor.
 
 
 72
 The Ninth Circuit, in accordance with the general rule, requires trial and appellate courts to seek reconciliation of apparently inconsistent verdicts:
 
 
 73
 When faced with a claim that verdicts are inconsistent, the court must search for a reasonable way to read the verdicts as expressing a coherent view of the case, and must exhaust this effort before it is free to disregard the jury's verdict and remand the case for a new trial.
 
 
 74
 Toner v. Lederle Laboratories, 828 F.2d 510, 512 (9th Cir.1987), cert. denied, --- U.S. ----, 108 S.Ct. 1122, 99 L.Ed.2d 282 (1988) (citing Gallick v. Baltimore & Ohio R.R., 372 U.S. 108, 119, 83 S.Ct. 659, 666, 9 L.Ed.2d 618 (1963), also citing Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd., 369 U.S. 355, 364, 82 S.Ct. 780, 786, 7 L.Ed.2d 798 (1962) and Blanton v. Mobil Oil Corp., 721 F.2d 1207, 1213, (9th Cir.1983), cert. denied, 471 U.S. 1007, 105 S.Ct. 1874, 85 L.Ed.2d 166 (1985)). See also Allen Organ Co., 839 F.2d at 1563, 5 USPQ2d at 1775 (the appellate court must make every effort to harmonize the jury's answers).
 
 
 75
 The district court did not find the special verdicts inconsistent, apparently in the belief that the jury limited infringement to the rising rate provision of claim 9 but not the other claim clauses. This accords with the court's statement to the jury that the infringement was "minor" because it was limited to the rising rate. This interpretation pleased neither party. If we have correctly understood it, it is incorrect as a matter of law.
 
 
 76
 "We are bound to find the special verdicts consistent if we can do so under a fair reading of them." Toner, 828 F.2d at 512. A fair reading of the special verdicts results from simply applying the rule that "[t]he consistency of the jury verdicts must be considered in light of the judge's instructions to the jury". Toner, 828 F.2d at 512. The instructions on infringement, and the specific questions asked by special verdict, were designed to resolve the issues raised at trial. There was testimony on both sides of Suzuki's assertion that its suspension was not the same as Richardson's because it produced a different rising rate. We referred supra to special verdicts 9(a)(2) and 9(b)(2):
 
 
 77
 9(a)(2). Does defendant's Model M produce rising rate substantially the same as the rising rate produced under the teachings of the plaintiff's patent?
 
 Answer: YES
 
 78
 9(b)(2). Does defendant's Model C produce rising rate substantially the same as the rising rate produced under the teachings of the plaintiff's patent?
 
 Answer: YES
 
 79
 Another special verdict in the infringement section asked the jury:
 
 
 80
 11. Does claim 9 of the Richardson Patent describe the invention of a rising rate in terms of what the invention will do rather than in terms of physical arrangement?
 
 Answer: NO
 
 81
 We conclude that the answer "yes, with the rising rate" in verdicts 9(a) and 9(b) is the jury's response to Suzuki's argument, rather than as a finding that only the rising rate claim limitation, and no other, is embodied in the Suzuki suspensions.
 
 
 82
 We discern no support in the record for the district court's conclusion that verdicts 9(a) and 9(b) meant that the rising rate was the only area of infringement. Structure corresponding to every element of every clause of claims 1 and 9 was identified by witnesses as embodied in the accused motorcycles. There was no real dispute that of the nine or eleven elements in these claims (depending on how counted), all but one were literally present. The dispute centered on one element, the attachment of the spring in the claim clause "spring means having a first end pivotally secured to said frame", since this was the clause affected by the modifications of the Alternate Shock Mount and the criss-cross. In the Alternate Shock Mount, as we have discussed, the spring is pivotally secured to a swing arm that in turn is pivotally secured to the frame, instead of being pivotally secured directly to the frame as is shown in the '332 specification.
 
 
 83
 Richardson argues that the spring can be either directly or indirectly pivotally secured to the frame, without avoiding literal infringement of the claim. Richardson alternatively argues that on a correct definition of the doctrine of equivalents, citing Graver Tank, 339 U.S. at 608, 70 S.Ct. at 856, these securements are equivalent because the structures are substantially the same and perform substantially the same function in the same way.
 
 
 84
 The jury had been given the dictionary definition that "equivalent" means "corresponding or virtually identical, especially in effect or function". This definition was reinforced by the phrasing of verdicts 9(a)(1) and 9(b)(1), wherein the question itself instructed the jury on the difference between the linkages, while remaining silent on the similarities.
 
 
 85
 This presentation was highly prejudicial. Indeed, these verdicts well illustrate the truism that the way a question is asked can direct the answer. "The decision to submit interrogatories, and the precise language in which they are couched, can have an untoward effect on a verdict, if certain elements of the trial or the evidence are thereby overly emphasized in the jury's mind." Weinar v. Rollform Inc., 744 F.2d 797, 809, 223 USPQ 369, 376 (Fed.Cir.1984),cert. denied, 470 U.S. 1084, 105 S.Ct. 1844, 85 L.Ed.2d 143 (1985).
 
 
 86
 Further, and equally prejudicial, special verdicts 9(a)(1) and 9(b)(1) isolated this specific claim element so that it was removed from the perspective that is obtained only when the claimed invention is viewed in its entirety. See, e.g., Hughes Aircraft Co. v. United States, 717 F.2d 1351, 1363, 219 USPQ 473, 482 (Fed.Cir.1983). We recently reemphasized in United States Steel Corp. v. Phillips Petroleum Co., 865 F.2d 1247, 1253 (Fed.Cir.1989), in discussing Graver Tank, that there is no error in considering "the principle of the claimed invention".
 
 
 87
 A device that embodies improvements on a claimed structure does not automatically avoid the reach of the claim. See, e.g., Atlas Powder Co. v. E.I. du Pont de Nemours & Co., 750 F.2d 1569, 1580, 224 USPQ 409, 417 (Fed.Cir.1984) (separately patentable improvement may also be an equivalent under the doctrine of equivalents); A.B. Dick Co. v. Burroughs Corp., 713 F.2d 700, 703, 218 USPQ 965, 967-68 (Fed.Cir.1983) (infringement not avoided "merely by adding elements"), cert. denied, 464 U.S. 1042, 104 S.Ct. 707, 79 L.Ed.2d 171 (1984). Each case must be decided on its particular facts, viewing the changes in the accused structure in light of the claimed invention. See generally Pennwalt Corp. v. Durand-Wayland, Inc., 833 F.2d 931, 934-35, 4 USPQ2d 1737, 1739 (Fed.Cir.1987), cert. denied, --- U.S. ----, 108 S.Ct. 1226, 99 L.Ed.2d 426 (1988), and cert. denied, --- U.S. ----, 108 S.Ct. 1474, 99 L.Ed.2d 703 (1988); Texas Instruments, Inc. v. United States Int'l Trade Comm'n, 805 F.2d 1558, 1569-70, 231 USPQ 833, 840 (Fed.Cir.1986), reh'g denied, 846 F.2d 1369, 6 USPQ2d 1886 (Fed.Cir.1988).
 
 
 88
 We conclude that the jury verdicts, viewed in light of the instructions, held that the Suzuki motorcycles with a rising rate infringed claim 9. We also conclude that on correct instructions no reasonable jury could have found that the claimed invention and the accused structures are not equivalent, on the established facts of record, applying the correct law of Graver Tank. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986) ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."); Pullman-Standard v. Swint, 456 U.S. 273, 291-92, 102 S.Ct. 1781, 1791-92, 72 L.Ed.2d 66 (1982) ("where findings [by the district court] are infirm because of an erroneous view of the law, a remand is the proper course unless the record permits only one resolution of the factual issue"); Dana Corp. v. IPC Limited Partnership, 860 F.2d 415, 419, 8 USPQ2d 1692, 1696 (Fed.Cir.1988) (when there are sufficient established facts of record, appellate court has discretion to determine the merits of JNOV motion.)
 
 
 89
 The jury verdicts of infringement are supported by substantial evidence, and are upheld. The judgment of infringement is affirmed.
 
 III
 Damages for Patent Infringement
 
 90
 As damages for patent infringement the jury assessed a royalty of fifty cents per motorcycle. Richardson states that this royalty is unreasonably low, and resulted from erroneous and prejudicial jury instructions. We review the award on the reasonable jury/substantial evidence standard. Shatterproof Glass Corp., 758 F.2d at 627-28, 225 USPQ at 643-44.
 
 
 91
 The court told the jury: "Now, I will sustain, I will uphold your verdict [of infringement], but in determining damages and determining any royalty, it seems to me that you must consider that the infringement was a relatively minor infringement." This instruction derived, as we have discussed, from the erroneous interpretation of the verdicts as limited to the "rising rate" clause. We must determine whether this erroneous instruction was prejudicial to the jury's assessment of damages. The Ninth Circuit has stated that "we will reverse a judgment because of a mistake in jury instructions only if the error was prejudicial." Smiddy v. Varney, 665 F.2d 261, 265 (9th Cir.1981), cert. denied, 459 U.S. 829, 103 S.Ct. 65, 74 L.Ed.2d 66 (1982).
 
 
 92
 35 U.S.C. Sec. 284 provides that damages shall be "adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer". Fromson v. Western Litho Plate and Supply Co., 853 F.2d 1568, 1574, 7 USPQ2d 1606, 1612 (Fed.Cir.1988). The jury was told that a royalty of $2.00 per motorcycle with an annual minimum of $70,000 had been agreed to by Suzuki and Richardson in the Option and License Agreement. There was testimony of much higher royalties paid by others for similar contributions to motorcycles. Suzuki presented testimony that the $2.00 in the agreement does not apply, but should be the starting point for reducing the royalty because the infringement was minor.
 
 
 93
 We must assume that the jury followed the court's instruction that the infringement was minor. That instruction was a misinterpretation of the jury verdict of infringement, and it usurped the role of the jury. Absent this prejudicial instruction there was no reasonable basis on which reasonable jury could have found that fifty cents was a reasonable royalty.
 
 
 94
 The judgment of damages for patent infringement is vacated. We remand for retrial of the question.
 
 IV
 Richardson's Technical Information
 
 95
 Issues relating to Richardson's technical information were presented at trial on the legal theories of breach of contract and the tort of misappropriation of trade secrets. The district court concentrated the tort issues in presentation to the jury, apparently accepting Suzuki's position that it had complied with its contractual obligations to Richardson. The court thus required that Richardson prove the existence of legally protectible trade secrets and their misappropriation by Suzuki.
 
 
 96
 In the only special verdict on the contract issues, the jury found that Suzuki did not violate its duty of good faith and fair dealing in its relationship with Richardson. The jury instructions on the contractual relationship, however, are pertinent to, and intertwined with, the trade secret issues.
 
 A. The Contractual Relationship
 
 97
 In matters of contract law and interpretation we apply the discernable law of the state of California. Universal Gym Equipment, Inc. v. ERWA Exercise Equipment Ltd., 827 F.2d 1542, 1550, 4 USPQ2d 1035, 1040 (Fed.Cir.1987). At trial Richardson pressed, unsuccessfully, the California law that a covenant of good faith and fair dealing is implied between parties to a contract. Seaman's Direct Buying Service, Inc. v. Standard Oil Co., 36 Cal.3d 752, 768, 686 P.2d 1158, 1166, 206 Cal.Rptr. 354, 363 (1984) ("It is well settled that, in California, the law implies in every contract a covenant of good faith and fair dealing." (Emphasis in original)).
 
 
 98
 The contract between Richardson and Suzuki was explained at trial, including the clause wherein Suzuki agreed not to use or disclose the "technical information, know-how, inventions, use data, and design specifications" that it received from Richardson. In discussing whether Suzuki was restrained in its post-contract use of Richardson's information, the district court at first instructed the jury that Suzuki was entitled by law "to use the most efficient means, even though they got it from plaintiff", stating that only "valid trade secrets" were subject to the contractual restraints:
 
 
 99
 And then after Suzuki's election not to take a license, of course, they were not supposed to use the plaintiff's trade secrets. That's what the contract says. And once again, you're going to have to determine whether these eleven were valid trade secrets. To what extent did the defendant use them, to what extent would the defendant otherwise have developed them.
 
 
 100
 Now, some of these trade secrets refer to the best alignments and designs. Well, it seems incongruous to say to the defendant they cannot use the best because the best was intentionally disclosed by the plaintiff, and even though experimentation by the defendant surely would have revealed the best as the patent says that it would.
 
 
 101
 Were the defendants precluded from using the best or were they obliged to use something less efficient. I can't conceive of the defendants not being entitled to use the most efficient means, even though they got it from the plaintiff.
 
 
 102
 The court later qualified this position by referring to reverse engineering as being improper--although it is far from clear what a reasonable jury would have understood from the court's instructions:
 
 
 103
 But on further reflection, I have to acknowledge that if you find there was a confidential relationship or contract that prohibited Suzuki from using the plaintiff's trade secrets, technical information or know-how, inventions or use data that the plaintiff gave them, unless it exercised the option, if you find those things to be true, I suppose it would be improper for Suzuki to reverse engineer from Richardson's prototypes, or from trade secrets or other information that he gave them.
 
 
 104
 The defense of reverse engineering does not apply to information received in confidence or whereas here the information is given under a contract.
 
 
 105
 Reviewing these instructions in the context of the contract and trade secret questions that were before the jury, we conclude that the jury was incorrectly instructed on the law. See Bulgo v. Munoz, 853 F.2d 710, 714 (9th Cir.1988) (quoting Los Angeles Memorial Coliseum Comm'n v. National Football League, 726 F.2d 1381, 1398 (9th Cir.), cert. denied, 469 U.S. 990, 105 S.Ct. 397, 83 L.Ed.2d 331 (1984)) (instructions reviewed to determine "whether, viewing the jury instructions as a whole, the trial judge gave adequate instructions on each element of the case to ensure that the jury fully understood the issues.")
 
 
 106
 In Universal Gym Equipment, 827 F.2d at 1549, 4 USPQ2d at 1040, we affirmed liability under California law based on breach of contract, when the parties contracted to limit the use by the recipient of "features, designs, technical information, or know-how" disclosed under the contract. We also affirmed that such a contractual arrangement is not incompatible with the patent law, id. at 1550, 4 USPQ at 1041, an issue on which the district court in Richardson's case also appears to have been misled, and to have misled the jury. See Components for Research, Inc. v. Isolation Products, Inc., 241 Cal.App.2d 726, 730, 50 Cal.Rptr. 829, 832 (1966) ("The judgment here but affords protection against the use of plaintiff's trade secrets by those to whom they had been disclosed in confidence. Whether the idea was patented or not, plaintiff is entitled to such protection").
 
 
 107
 The district court erred in law, in limiting the scope of protected information beyond that set forth in the contract, and in its instructions to the jury as to Suzuki's obligations. These errors are reflected in the trade secret issues.
 
 B. The trade secret issues
 
 108
 The jury, despite the excessively restrictive instructions on what were trade secrets, found that certain items that Suzuki had received from Richardson were trade secrets and had been misappropriated, and assessed damages therefor. The jury also assessed damages for use by Suzuki of certain other items that did not "rise to the dignity of trade secrets", in the words of the special verdicts.
 
 
 109
 Richardson specified eleven items that he had disclosed to Suzuki under the contract, and that he asserted to be trade secrets; to wit: (1) the optimal characteristics of a motorcycle rear-wheel suspension shock absorber, showing three external adjustments, (2) engineering drawings of his proposed and furnished suspension systems, (3) 1978 and 1979 Suzuki motorcycles modified by Richardson with his rising rate suspension, (4) specific force-velocity curves needed to obtain the advantages of Richardson's invention in Suzuki's motorcycles, (5) design modifications to extend rear wheel travel over earlier rising-rate designs, (6) design of the Alternate Shock Mount including drawings and knowhow, (7) the optimum use and types of certain bearings in the suspension, (8) motorcycle testing and tuning criteria, (9) his bell crank designs and design criteria, (10) adjustments in the angles and dimensions of the parts of the suspension and their effect on performance, and (11) the straight line tubular motorcycle frame.
 
 
 110
 The California law of trade secrets follows the Restatement definition:
 
 
 111
 A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it.... Generally it relates to the production of goods, as, for example, a machine or formula for the production of an article.
 
 
 112
 By-Buk Co. v. Printed Cellophane Tape Co., 163 Cal.App.2d 157 at 166, 329 P.2d 147 at 152, 118 USPQ 550 at 553, (1958) citing Restatement (First) of Torts, Sec. 757 comment b (1939). The court in By-Buk Co. reaffirmed "plaintiff's right not to have its [trade secret] processes wrongfully disclosed to others and used to its detriment." Id. at 167, 329 P.2d at 153, 118 USPQ at 553.
 
 
 113
 The burden of proof was placed on Richardson to prove that his information met the legal requirements of a protectible trade secret. Forro Precision, Inc. v. International Business Machines Corp., 673 F.2d 1045, 1056-57, 215 USPQ 299, 305-6 (9th Cir.1982). This in turn required "either a covenant or a confidential relationship" as a premise of relief. Futurecraft Corp. v. Clary Corp., 205 Cal.App.2d 279, 283, 23 Cal.Rptr. 198, 207-08 (1962) (discussing elements of trade secret protection). Richardson met this requirement through his contractual covenant.
 
 
 114
 The district court told the jury, several times, that because Suzuki might have developed or could have developed on its own the information it received from Richardson, such information can not be protected as a trade secret. The court said: "Now I think we must assume that the defendant could have accomplished whatever the plaintiff may have contributed toward the development of Models M and C." Whatever the validity of the proposed assumption as to Suzuki's abilities, the court's conclusion is contrary to California law:
 
 
 115
 It is not necessary in order that a process of manufacture be a trade secret that it be patentable or be something that could not be discovered by others by their own labor and ingenuity.
 
 
 116
 By-Buk Co., 163 Cal.App.2d at 166, 329 P.2d at 152, 118 USPQ at 553. Nor does the possibility of independent discovery relieve Suzuki of liability:
 
 
 117
 "[S]ecret formulas and processes * * * are property rights which will be protected by injunction, not only as against those who attempt to disclose or use them in violation of confidential relations or contracts express or implied, but as against those who are participating in such attempt with knowledge of such confidential relations or contract, though they might in time have reached the same result by their own independent experiments or efforts."
 
 
 118
 Id. at 167, 329 P.2d at 153, 118 USPQ at 553-54 (quoting Herold v. Herold China & Pottery Co., 257 F. 911, 913 (6th Cir.1919)). Indeed, Suzuki did not argue that it had actually developed on its own the information that it first received from Richardson. Although Richardson adduced evidence that Suzuki had been unable to solve this problem, it is not relevant what Suzuki might have been able to do on its own. Ninth Circuit law upholds trade secret status even had the same information been obtainable from other sources. Clark v. Bunker, 453 F.2d 1006, 1010, 172 USPQ 420, 423 (9th Cir.1972) (trade secrecy "is not negated because defendant by an expenditure of effort might have collected the same information from sources available to the public.") (footnote omitted).
 
 
 119
 The court also erroneously instructed the jury that "slavish" copying is necessary for misappropriation, and that an exercise of independent judgment would remove the information from protection. The court instructed the jury to consider: "Were they secrets. And, second, did the defendants slavishly use them or did they make up their own minds." These views are contrary to California law. "[D]efendants cannot escape responsibility by showing that they have improved upon or modified the plaintiff's process." By-Buk Co., 163 Cal.App.2d at 169, 329 P.2d at 154, 118 USPQ at 554. The court observed in Sinclair v. Aquarius Electronics, Inc., 42 Cal.App.3d 216, 222, 116 Cal.Rptr. 654, 659, 184 USPQ 682, 684 (1974) that minor variations are to be expected.
 
 
 120
 Suzuki argued to the jury, and repeats on appeal, that information that Richardson developed after issuance of the '332 patent, including the Alternate Shock Mount, is barred from trade secret status because it was generally disclosed in Richardson's patent or known to the general public, or because it merely implements the patented invention.
 
 
 121
 The legal status of information and improvements made after a patent application has been filed is independent of the presence, or absence, of the patent application or ensuing patent. The information and improvements may be separately patentable; they may be preserved in confidence and disclosed only in accordance with agreement; and they are protected against misappropriation in accordance with the laws of contract and tort. The court misstated the law in telling the jury that the jury could decide whether Richardson could have both a valid patent and legal protection for later-developed information on the patented invention:
 
 
 122
 So on the one hand [Richardson] says the ordinary person skilled in the art can take this patent and use it and make a machine based upon it. But, on the other hand, he says, however, the experimentation and the ability to do this constitutes trade secrets for which you must pay me. Now, that constitutes a dilemma and it's up to you to determine the extent to which Mr. Richardson may claim as trade secrets things that the ordinarily prudent person skilled in the art should be able to do on his own.
 
 
 123
 The district court's phrase "should be able to do on his own" may explain its misperception of the law. It is not known what Suzuki was able to do on its own, for Suzuki not only sought Richardson's knowhow, improvements, data, and information, but also agreed to respect the confidentiality thereof. This information is intellectual property in the eyes of the law, and is protected in accordance with law. See generally Kewanee Oil Co. v. Bicron Corp., 416 U.S. 470, 493, 94 S.Ct. 1879, 1892, 40 L.Ed.2d 315 (1974). See also Components for Research, Inc., 241 Cal.App.2d at 730, 50 Cal.Rptr. at 832 (whether the product design was patented or not, plaintiff is entitled to trade secret protection for manufacturing process); Sinclair, 42 Cal.App.3d at 225, 116 Cal.Rptr. at 660, 184 USPQ at 686 ("Trade secret law encourages invention in areas where patent law does not reach"). Accord Thermotics, Inc. v. Bat-Jac Tool Co., Inc., 541 S.W.2d 255, 261, 193 USPQ 249, 253 (Tex.Civ.App.1976) (post-patent improvement protectable under trade secret law); Franke v. Wiltschek, 209 F.2d 493, 495, 99 USPQ 431, 433 (2d Cir.1953) (immaterial that defendants could have derived trade secrets from expired patent).
 
 
 124
 It is apparent that the court imposed a higher standard for trade secret status than is contained in California law. The court's instructions, commentary, and phrasing of the special verdicts not only placed a prejudicially heavy burden on Richardson, but also demeaned the information itself.
 
 
 125
 Despite this prejudicial environment, the jury found that items 5 and 6 were trade secrets and had been misappropriated by Suzuki, and assessed damages therefore. The jury also found that items 1-4 and 7-11 were not trade secrets, and that for some but not all of these items compensation should be awarded based on "benefit from the plaintiff's knowledge and from the time and effort expended by him".
 
 
 126
 The district court granted Suzuki's motion for a new trial with respect to items 5 and 6, and upheld the jury verdicts with respect to items 1-4 and 7-11.
 
 C. The new trial of items 5 and 6
 
 127
 The grant of a new trial is ordinarily not reviewable, but on this issue the district court entered final judgment for purposes of appeal, and certified three questions. The first certified question is:
 
 
 128
 1. Were the plaintiff's asserted trade secrets Nos. 5 and 6: (a) Actually valid proprietary trade secrets, as the jury found and awarded very substantial royalties; or (b) Did the plaintiff's contributions in these respects represent no more than the services of a skilled mechanic, which readily could have been duplicated by the defendant, and which entitled the plaintiff only to quantum meruit compensation, as the court believes; or (c) Were the plaintiff's contributions no more than those contemplated under the option agreement and paid for by the defendant, as the defendant contends?
 
 
 129
 We respond to this question: From the record before us the jury verdict that items 5 and 6 met the requirements for trade secret protection was supported by the great weight of the evidence. Richardson and Cazort testified about the design modifications that were the subject of item No. 5 and the Alternate Shock Mount subject of item No. 6. The Alternate Shock Mount was considered sufficiently novel and valuable that Suzuki included it in a patent application filed in Japan and later in the United States. The record does not negate the jury's determination of the value of this information. According to California law it is immaterial what Suzuki could have done, for it chose to use Richardson's information, which it obtained under restraint.
 
 
 130
 In further response, we remark that the relation between the parties, set by contract, was a routine commercial arrangement wherein Richardson agreed to facilitate Suzuki's testing and evaluation of Richardson's invention. This did not convert Richardson's work in adapting his invention to Suzuki's motorcycle into the work of a hired technician whose work product was automatically owned by Suzuki. The proprietary nature of the work done and information provided by Richardson was established by agreement, as was the agreement that Suzuki would not use this information if it did not exercise its option.
 
 
 131
 There was substantial evidence before the jury that the information on items 5 and 6 was not publicly known, that Suzuki agreed to receive and preserve it in confidence, and that the information fully satisfies the statutory and jurisprudential requirements for protectible trade secrets.
 
 
 132
 In order to vacate the jury's verdict upholding items 5 and 6 as trade secrets and grant a new trial thereon, the trial court must find that the jury's verdict "is contrary to the clear weight of the evidence, or is based upon evidence which is false, or to prevent, in the sound discretion of the trial judge, a miscarriage of justice." Hanson v. Shell Oil Co., 541 F.2d 1352, 1359 (9th Cir.1976), cert. denied, 429 U.S. 1074, 97 S.Ct. 813, 50 L.Ed.2d 792 (1977) (quoting Moist Cold Refrigerator Co. v. Lou Johnson Co., 249 F.2d 246, 256, 115 USPQ 160, 168-69 (9th Cir.1957), cert. denied, 356 U.S. 968, 78 S.Ct. 1008, 2 L.Ed.2d 1074 (1958)); William Inglis & Sons Baking Co. v ITT Continental Baking Co., Inc., 668 F.2d 1014, 1027 (9th Cir.1981), cert. denied, 459 U.S. 825, 103 S.Ct. 57, 74 L.Ed.2d 61 (1982). It is insufficient that the district court would simply have reached a different verdict.
 
 
 133
 Our review requires determination of whether the district court abused its discretion in its decision to grant the new trial. Id. See Transgo, Inc. v. Ajac Transmission Parts Corp., 768 F.2d 1001, 1014, 227 USPQ 598, 602 (9th Cir.1985), cert. denied, 474 U.S. 1059, 106 S.Ct. 802, 88 L.Ed.2d 778 (1986) ("the grant or denial of either a motion for a new trial or a motion to amend the judgment must be reviewed on the basis of a determination of whether the district court abused its discretion.") See generally Seattle Box Co. v. Industrial Crating & Packing, Inc., 756 F.2d 1574, 1581, 225 USPQ 357, 363 (Fed.Cir.1985) ("Abuse of discretion may be established by showing that the district court either made an error of law, or a clear error of judgment, or made findings which were clearly erroneous.") The district court's statements, for example with respect to item 5, "I simply cannot conclude that that is a trade secret. It was an attempt to help Suzuki adapt the Richardson concept to the Suzuki machine ...", reflect an error of law.
 
 
 134
 Despite the legal error in the instructions, as we have discussed, any prejudice resulting therefrom favored Suzuki, not Richardson. We conclude that the district court exceeded its discretionary authority in vacating the jury verdict and ordering a new trial. That action is reversed, and the jury verdict is reinstated as to items Nos. 5 and 6, including the damages assessed for items Nos. 5 and 6.
 
 D. Items 1-4 and 7-11
 
 135
 For asserted trade secrets Nos. 1-4 and 7-11, the jury may well have been led by erroneous instructions into applying an incorrect legal standard, in finding that these items were not trade secrets. It appears, however, that Richardson did not move for judgment n.o.v. or a new trial on these verdicts. Although there is a hint in the post-trial colloquy that the court intended or was willing to retry all the trade secret issues along with items 5 and 6, this does not satisfy the rule, supported by logic, that the formalities of post-trial motions be respected. Snellman v. Ricoh Co., 836 F.2d 528, 534, 5 USPQ2d 1341, 1346 (Fed.Cir.1987) (applying Ninth Circuit law in holding that motions for judgment n.o.v. and for a new trial must be made). Thus we have no authority to review these verdicts.
 
 
 136
 By special verdict the jury was also asked to assess damages for Suzuki's use of the information encompassed in each of items 1-4 and 7-11, even if the information did not "rise to the dignity of trade secrets". The jury determined this sum for each item, some at $0, the highest at $25,000, for a total of $104,000. The district court sustained this award, on a theory of "quantum meruit compensation". Both parties appeal this award, Richardson asserting its inadequacy, and Suzuki arguing that Richardson was fully paid for his information in the option agreement, and is not entitled to damages for Suzuki's use of any information received from Richardson.
 
 
 137
 We have rejected, as a matter of law, Suzuki's theory that it is entitled to use, free, the information disclosed by Richardson under the option agreement. Richardson's disclosures were made under terms that prohibited their use by Suzuki if the option was not exercised. This contract provision does not depend on whether the information is a trade secret, but only on whether it was previously known to Suzuki or generally known to the public, as discussed ante.
 
 
 138
 An appellate tribunal is abjured to determine whether a jury verdict can be sustained, on any reasonable theory. Jaffke v. Dunham, 352 U.S. 280, 281, 77 S.Ct. 307, 308, 1 L.Ed.2d 314 (1957) ("A successful party in the District Court may sustain its judgment on any ground that finds support in the record.")
 
 
 139
 There was substantial evidence at trial whereby a reasonable jury could have determined the sums awarded by this jury. Indeed, Suzuki does not challenge the valuations of the damage awards for items 1-11, arguing instead that nothing at all is owing.
 
 
 140
 The judgment as to items 1-4 and 7-11 is affirmed, including damages assessed for these items in the total amount of $104,000.
 
 V
 Injunction
 
 141
 The district court, having entered final judgment that the Suzuki Full Floater suspension infringed claim 9 of the '332 patent, denied Richardson's motion for injunction.
 
 
 142
 Infringement having been established, it is contrary to the laws of property, of which the patent law partakes, to deny the patentee's right to exclude others from use of his property. 35 U.S.C. Sec. 261. "[T]he right to exclude recognized in a patent is but the essence of the concept of property". Connell, 722 F.2d at 1548, 220 USPQ at 198 (citing Schenck v. Nortron Corp., 713 F.2d 782, 218 USPQ 698 (Fed.Cir.1983)).
 
 
 143
 It is the general rule that an injunction will issue when infringement has been adjudged, absent a sound reason for denying it. W.L. Gore & Associates, Inc. v. Garlock, Inc., 842 F.2d 1275, 1281, 6 USPQ2d 1277, 1283 (Fed.Cir.1988). Suzuki has presented no such reason. This court stated in H.H. Robertson Co. v. United Steel Deck, Inc., 820 F.2d 384, 390, 2 USPQ2d 1926, 1929-30 (Fed.Cir.1987), when reviewing an injunction granted pendente lite:
 
 
 144
 In matters involving patent rights, irreparable harm has been presumed when a clear showing has been made of patent validity and infringement. Smith International, 718 F.2d at 1581, 219 USPQ at 692. This presumption derives in part from the finite term of the patent grant, for patent expiration is not suspended during litigation, and the passage of time can work irremediable harm.
 
 
 145
 We observe that the '332 patent will expire in less than four years, that litigation started over eight years ago, and that the district court remarked that further proceedings could consume "several years".
 
 
 146
 Further, a misappropriator of trade secrets has no authorization of right to continue to reap the benefits of its wrongful acts. Richardson is entitled to an injunction against Suzuki's continuing use of trade secrets Nos. 5 and 6. By-Buk Co., 163 Cal.App.2d at 167, 329 P.2d at 153, 118 USPQ at 553-54; Components for Research, Inc., 241 Cal.App.2d at 730, 50 Cal.Rptr. at 832.
 
 
 147
 The denial of Richardson's request for injunction is reversed. On remand the district court shall enter appropriate injunctive relief.
 
 VI
 Fraud
 
 148
 The jury found by special verdicts that Suzuki fraudulently induced Richardson to reveal his trade secrets by concealing its intention not to exercise its option or take a license, and that Suzuki fraudulently concealed from Richardson the fact that it was developing the Full Floater "with the intention of declining to exercise the option and then nevertheless to utilize the plaintiff's trade secrets in the full floater". The jury also found fraud in that Suzuki filed the Tamaki patent application "in the knowledge that the invention asserted therein (the spring/swing arm connection) was first disclosed to them by Richardson". The jury awarded Richardson $20,000 in compensatory and $100,000 in punitive damages.
 
 
 149
 The district court vacated the judgment and ordered a new trial. Suzuki asserts that the court should have granted Suzuki's motion for judgment n.o.v. instead of ordering a new trial, while Richardson asserts that the court should have upheld the jury verdicts.
 
 
 150
 The district court certified the question of how to treat its belief that Suzuki did not commit the offenses of fraud and concealment found by the jury, including the question of punitive damages. We first must consider whether a reasonable jury could have reached the verdicts here reached. Lavender v. Kurn, 327 U.S. at 653, 66 S.Ct. at 744. Apt is the statement of the Ninth Circuit in Crocker-Citizens Nat'l Bank v. Control Metals Corp., 566 F.2d 631, 635 (9th Cir.1977): "Courts are not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable", quoting Cockrum v. Whitney, 479 F.2d 84, 86 (9th Cir.1973), in turn quoting Tennant v. Peoria & P.U. Ry. Co., 321 U.S. 29, 35, 64 S.Ct. 409, 412, 88 L.Ed. 520 (1944).
 
 
 151
 The record shows that there was testimony, based on certain of Suzuki's documents, on which a reasonable jury could have supported these verdicts. There were issues of credibility, and inferences that could reasonably have been drawn in a manner adverse to Suzuki. "The credibility of witnesses and the weight of the evidence are issues for the jury and are generally not subject to appellate review." Benigni, 853 F.2d at 1525. While the district court may have believed that Suzuki did not commit fraud, review shows that the requirements for vacating the jury verdicts and relitigating the issue were not met. Hanson, 541 F.2d at 1359; William Inglis, 668 F.2d at 1027. A fresh trial is not warranted simply because the district court would have reached a different verdict.
 
 
 152
 A jury assessment of punitive damages is not excluded in circumstances such as those here presented, where the jury expressly found fraud. Tri-Tron Int'l v. Velto, 525 F.2d 432, 437, 188 USPQ 177, 181 (9th Cir.1975) ("where compensatory damages are sought and awarded, the court has power, on a proper record, to award punitive damages"), citing Clark v. Bunker, 453 F.2d 1006, 1012, 172 USPQ 420, 424 (9th Cir.1972), in turn citing El Rancho, Inc. v. First Nat'l Bank, 406 F.2d 1205, 1218 (9th Cir.1968), cert. denied, 396 U.S. 875, 90 S.Ct. 150, 24 L.Ed.2d 133 (1969) (jury verdict awarding punitive damages was supported by evidence of malice) and Davenport v. Mutual Benefit Health & Accident Ass'n, 325 F.2d 785, 787 (9th Cir.1963) (remand for trial to allow evidence of fraud to support claim of punitive damages.)
 
 
 153
 The district court correctly instructed the jury as to the law, stating that "it's only if you find that the defendants' conduct stem from malice, oppression, fraud or bad faith that you can find any punitive damage at all." As stated in In re Innovative Construction Systems, Inc., 793 F.2d 875, 889, 230 USPQ 94, 104 (7th Cir.1986):
 
 
 154
 [A] breach of faith underlies every trade secret claim. However, establishing that breach alone is insufficient to warrant an award of punitive damages; one must also demonstrate that the defendant acted wantonly, willfully, or in reckless disregard of the plaintiff's rights. (Citations omitted)
 
 
 155
 See also Neal v. Farmers Insurance Exchange, 21 Cal.3d 910, 928, 582 P.2d 980, 986, 148 Cal.Rptr. 389, 395 (1978) ("In order to justify an award of exemplary damages, the defendant must be guilty of oppression, fraud or malice. (Civ.Code Sec. 3294.) He must act with the intent to vex, injure or annoy, or with a conscious disregard of the plaintiff's rights") (quoting Silberg v. California Life Insurance Co., 11 Cal.3d 452, 462, 521 P.2d 1103, 1110, 113 Cal.Rptr. 711, 718 (1974)); Reynolds Metals Co. v. Lampert, 316 F.2d 272, 275 (9th Cir.1963), cert. denied, 376 U.S. 910, 84 S.Ct. 664, 11 L.Ed.2d 608 (1964) (in jury trial, evidence to justify punitive damages must show injury was done maliciously or willfully and wantonly or committed with bad motive or recklessly); Transgo, Inc., 768 F.2d at 1024 (The determination to award punitive damages was "within the exclusive province of the jury") (quoting Runge v. Lee, 441 F.2d 579, 584, 169 USPQ 388, 392 (9th Cir.), cert. denied, 404 U.S. 887, 92 S.Ct. 197, 30 L.Ed.2d 169 (1971)).
 
 
 156
 The jury having found by special verdicts that Suzuki acted fraudulently, the requisite intent was established. "We give the trial judge and jury wide discretion in assessing punitive damages." Hatrock v. Edward D. Jones & Co., 750 F.2d 767, 772 (9th Cir.1984). The jury's award was not "so disproportionate to the damages sustained as to be the result of passion or prejudice". Id. (citing Neal, 21 Cal.3d at 928, 582 P.2d at 990, 148 Cal.Rptr. at 399). Transgo, Inc., 768 F.2d at 1024 ("We will not overturn such an award unless it appears that the jury was influenced by passion or prejudice.") (citing Harmsen v. Smith, 693 F.2d 932, 947 (9th Cir.1982), cert. denied, 464 U.S. 822, 104 S.Ct. 89, 78 L.Ed.2d 97 (1983)).
 
 
 157
 We answer the certified question that, in this case, neither a new trial nor judgment n.o.v. was warranted. The order of a new trial on this issue is vacated. The judgment on the jury verdicts of fraud and the award of compensatory and punitive damages is reinstated.VII
 
 The Tamaki Patent
 
 158
 Richardson states that Suzuki fraudulently patented the Alternate Shock Mount that had been disclosed to Suzuki by Richardson and Cazort, in a patent that also described the "criss-cross" modification developed at Suzuki. There was evidence and argument on the factual premises, including the absence of supporting documentation on the part of the named inventors Hirohide Tamaki and Manabu Suzuki, the earliest record on their behalf being dated October 1979. The corresponding Japanese patent application was filed on October 16, 1979.
 
 
 159
 The jury rendered the following special verdicts:
 
 
 160
 C-3. Did Suzuki and/or Mr. Tamaki file the Tamaki patent application in the knowledge that the invention asserted therein (the spring/swing arm connection) was first disclosed to them by Richardson:
 
 Answer: YES
 
 161
 H-1. Do you find that the Plaintiff, Richardson, is the real inventor of the invention shown in the Tamaki patents and patent applications?
 
 Answer: NO
 
 162
 It was not significantly disputed at trial that claims 1 through 8 of the Tamaki corresponding United States Patent No. 4,457,393 cover the Alternate Shock Mount of Richardson and Cazort, and that claim 9 includes the criss-cross embodiment of Tamaki and Suzuki. (The scope of claim 5 is raised, but is not material to our conclusion.)
 
 
 163
 The district court denied Richardson's post-trial motion that the Tamaki patent be assigned to Richardson. In colloquy with counsel the court explained that it could not do so because "the jury said Richardson wasn't the inventor". Indeed it was conceded, and discussed at trial, that Richardson and Cazort, not Richardson alone, invented the Alternate Shock Mount. Cazort, as well as Richardson, testified at length on this structure. Special verdict H-1 that Richardson is not "the real inventor" is in accord with the co-inventor status of Cazort, and also with the Japanese contribution of the criss-cross embodiment.
 
 
 164
 The force of special verdict C-3 is not diminished. This verdict was not challenged on appeal. "It was further the duty of the court to direct the appropriate judgment to be entered upon the special verdict." Traders and General Insurance Co. v. Mallitz, 315 F.2d 171, 175 (5th Cir.1963). The district court having failed to implement this verdict, Richardson's motion for judgment and for assignment of the Tamaki patents was not out of order.
 
 
 165
 The remedy of assignment of the Tamaki patents is a different question from whether Richardson is a sole or joint inventor. The correction of inventorship is an administrative step, and is not before the court. Similarly, the presence of a further modification in one or two claims of the patent directed to the Alternate Shock Mount does not negate the imposition of an equitable remedy. To hold otherwise would ratify and indeed reward the wrongdoing.
 
 
 166
 Based on the jury verdict, Richardson is entitled to ownership of the patents as against Suzuki. Such remedy is appropriate under the circumstances; see, e.g., Colgate-Palmolive Co. v. Carter Products, Inc., 230 F.2d 855, 865, 108 USPQ 383, 391 (4th Cir.), cert. denied, 352 U.S. 843, 77 S.Ct. 43, 1 L.Ed.2d 59 (1956) (corporate assignee of patent application ordered to assign to original holder of trade secrets all rights to patent applications based thereon); De Long Corp. v. Lucas, 176 F.Supp. 104, 134 (S.D.N.Y.1959), aff'd, 278 F.2d 804 (2nd Cir.), cert. denied, 364 U.S. 833, 81 S.Ct. 71, 5 L.Ed.2d 58 (1960) (when an employee has acquired patents on inventions developed by his former employer, "the courts will hold the wrongdoer to be a constructive trustee of the property misappropriated and will order a conveyance by the wrongdoer to the former employer"); Becher v. Contoure Laboratories, Inc., 279 U.S. 388, 49 S.Ct. 356, 73 L.Ed.2d 752 (1929) (same); Saco-Lowell Shops v. Reynolds, 141 F.2d 587, 598, 61 USPQ 3, 13 (4th Cir.1944) (requiring assignment of patent based on ideas received by licensee from licensor in confidence during development of invention for market).
 
 
 167
 Suzuki argues that Richardson has no remedy other than by seeking an interference in the United States Patent and Trademark Office with his own invention, and presumably by taking similar actions, if such are available, in other countries. We do not agree. The courts are not powerless to redress wrongful appropriation of intellectual property by those subject to the courts' jurisdiction.
 
 
 168
 The denial of Richardson's motion for judgment is reversed. Suzuki shall assign to Richardson the patents filed by Suzuki that include the Richardson/Cazort invention of the Alternate Shock Mount, in all countries. We remand to the district court for the purpose of implementing compliance.
 
 VIII
 Prejudgment Interest
 
 169
 The district court denied Richardson's request for prejudgment interest on both the patent infringement and the trade secret damage awards. Prejudgment interest is the rule governing this class of award. General Motors Corp. v. Devex Corp., 461 U.S. 648, 655, 103 S.Ct. 2058, 2062, 76 L.Ed.2d 211, 217 USPQ 1185, 1188 (1983); Lummus Industries, Inc. v. D.M. & E. Corp., 862 F.2d 267, 274, 8 USPQ2d 1983, 1988 (Fed.Cir.1988); Fromson, 853 F.2d at 1573-74, 7 USPQ2d at 1611; Bio-Rad Laboratories, Inc. v. Nicolet Instrument Corp., 807 F.2d 964, 967, 1 USPQ2d 1191, 1193 (Fed.Cir.1986), cert. denied, 482 U.S. 915, 107 S.Ct. 3187, 96 L.Ed.2d 675 (1987).
 
 
 170
 No exceptional circumstances having been shown, and no reason why damages for misappropriated trade secrets should be treated differently from damages for patent infringement, the denial of prejudgment interest is reversed.
 
 IX
 Willful Infringement and Exceptional Case
 
 171
 The district court refused to submit the question of willful infringement to the jury, stating that Richardson had not provided sufficient evidence to go to the jury.
 
 
 172
 To refuse to give an issue to the jury is to direct a verdict in favor of the opposing party. Thus we review the district court's ruling on the standard of "whether the evidence permits only one reasonable conclusion after viewing the evidence in the light most favorable to the non-moving party and drawing all inferences in favor of that party." Bulgo v. Munoz, 853 F.2d 710, 714 (9th Cir.1988) (citing Peterson v. Kennedy, 771 F.2d 1244, 1256 (9th Cir.1985), cert. denied, 475 U.S. 1122, 106 S.Ct. 1642, 90 L.Ed.2d 187 (1986)). See also Connell, 722 F.2d at 1546, 220 USPQ at 197.
 
 
 173
 Richardson refers to the evidence adduced in connection with the jury verdicts of fraud, to the verdicts of misappropriation of trade secrets 5 and 6, to the absence of any opinion of United States counsel concerning validity of the '332 patent when Suzuki started its infringing activity, and to evidence from Suzuki's records tending to show bad faith. Viewing this evidence in the light most favorable to Richardson, and drawing all reasonable inferences in his favor, there was sufficient evidence to take to the jury, for the evidence does not require a verdict in favor of Suzuki. Absent sufficient basis for directing the verdict, Richardson has the right of jury determination of this factual question. Willfulness of behavior is a classical jury question of intent. Shiley, 794 F.2d at 1568, 230 USPQ at 115; Hammerquist v. Clarke's Sheet Metal, Inc., 658 F.2d 1319, 1325-26, 212 USPQ 481, 486 (9th Cir.1981), cert. denied, 460 U.S. 1052, 103 S.Ct. 1499, 75 L.Ed.2d 930 (1983). When trial is had to a jury, the issue should be decided by the jury.
 
 
 174
 We remand for this purpose. The jury's findings on the issue of willfulness will be pertinent not only to the question of multiplication of damages under 35 U.S.C. Sec. 284, but also to determination of whether this is an exceptional case in terms of 35 U.S.C. Sec. 285. Entitlement under California Civil Code Sec. 3426 et seq. may also be considered.
 
 X
 Other Arguments
 
 175
 Both sides have raised many points in their briefs, disputing most aspects of the proceedings. We have considered all arguments in reaching our conclusions.
 
 Costs
 
 176
 The award by the trial court of only one third costs to Richardson, in view of the judgments in his favor on the major substantive issues, exceeded the trial court's discretionary authority. Richardson is entitled to his statutory costs incurred before the district court. The reduction thereof is reversed.
 
 
 177
 Costs on this appeal are taxed in favor of Richardson.
 
 
 178
 AFFIRMED IN PART, REVERSED IN PART, VACATED IN PART, AND REMANDED
 
 
 
 [1]
 Richardson v. Suzuki Motors Co. and Suzuki U.S. Motors Corp., Nos. CV 80-2589-WPG and CV 82-3826-WPG (C.D.Cal. June 29, 1987 and July 13, 1987)
 
 
 [2]
 "Rising rate" was described by witnesses as follows: "as the suspension travels upward, the resistance to upward travel will increase"; and it "gets stiffer as the wheel moves up toward the vehicle or moves upward in the frame."
 
 
 [3]
 The additional aspects of adequacy of disclosure (35 U.S.C. Sec. 112) and unenforceability for inequitable conduct, both decided in favor of Richardson, have not been appealed